[Crim. No. 1073.  Second Appellate District, Division Two.—July 29, 1924.]

## THE PEOPLE, Respondent, v. JOSE YBARRA, Appellant.

[1] CRIMINAL LAW — EVIDENCE — DYING DECLARATIONS. — Statements made by a mortally wounded person, who repeatedly says that he does not expect to recover, followed by death from the identical injuries which he had in mind, after being committed to a hospital by a physician who swears that he believed the patient would die, furnish sufficient ground for the conclusion that such statements emanated from a mind impressed with the solemnity of the occasion as though under the binding force of a legal oath; and this is essentially so when such facts are supported by the conditions revealed by an operation and autopsy.

[2] ID.—DYING DECLARATIONS—CONDITION OF MIND.—As to the admissibility of statements of an alleged dying person, it is the condition of the mind that governs, rather than the construction to be placed upon peculiar circumstances such as the degree of possibility that the person might, with described symptoms, have recovered.

[3] ID.—MURDER—CAUSES OF INJURY—BY WHOM INFLICTED—DYING DECLARATIONS.—The statements of a person as to his injuries and as to who had inflicted them upon him are admissible as dying declarations in a prosecution for murder, where such person was beaten and ruptured internally, and experienced physicians and surgeons recognized his condition as being fatal, and such person repeatedly stated that he believed he must die, and he did die from such rupture, though some days later.

[4] ID.—CORPUS DELICTI—DEATH DUE TO CRIMINAL AGENCY—EVIDENCE.—In this prosecution for murder, the argument that the evidence furnishes grounds for an inference that death could have resulted from accident or natural causes and that the *corpus delicti* was therefore not established is untenable for the reason that there is much evidence tending to prove criminal agency, and this testimony, the statements of the decedent and of defendant were predicated upon sufficient foundation and were properly admitted.

1. Admissibility of dying declarations, note, 56 L. R. A. 353. See, also, 13 Cal. Jur. 719; 1 R. C. L. 528.

2. Necessity of expectation of immediate death to render dying declaration admissible, note, 17 Ann. Cas. 287. See, also, 13 Cal. Jur. 721; 1 R. C. L. 539.

4. Proof of *corpus delicti* in criminal case, notes, 1 Ann. Cas. 823; 68 L. R. A. 33. See, also, 13 Cal. Jur. 676; 13 R. C. L. 736.

[5] ID.—ALIBI—EVIDENCE—PROVINCE OF JURY.—In such prosecution it was within the exclusive province of the jury to determine whether defendant had made conflicting statements upon the question of his asserted alibi, and if so which, together with all the other evidence in the case, was true.

[6] ID.—IDENTIFICATION—EVIDENCE—DECLARATIONS OF DECEASED.— In such prosecution, where the identification of defendant in a restaurant as one of the men who had held deceased up was established by evidence other than declarations by deceased to members of his family, which evidence included the statement of defendant himself that deceased pointed him out at that place, whether or not deceased told his family that he had identified that defendant in the restaurant, it was not an issue, and any error in admitting testimony as to what deceased said in that behalf was harmless.

[7] ID. — EVIDENCE — ALLEGED IMPEACHMENT OF WITNESS. — In such prosecution, where the prosecution, being surprised by the testimony of a witness, that she saw only dirt upon defendant's face when defendant entered her restaurant, because on the preliminary examination she had testified that she saw blood on his face when he entered her restaurant, sought to refresh her memory by submitting to the witness the particular testimony given at the preliminary examination, and the witness then testified that the prosecution must have misunderstood her at the preliminary examination, because she did not know about any blood being on defendant's face, that it was dirt, the action of the prosecution was not an attempt to impeach the witness, but it brought forth testimony favorable to the defendant, and in any event would not constitute prejudicial error.

[8] ID. — INSTRUCTION NOT APPLICABLE TO FACTS — ABSENCE OF PREJUDICE.—In such prosecution, where there was no evidence as to any weapon, the giving of an instruction that "when one person assails another violently with a dangerous weapon, likely to kill, and which in fact does destroy the life of the party assailed, the natural presumption is that such assailant intended death, or other great bodily harm, and in the absence of evidence to the contrary this presumption must prevail," was not prejudicial.

[9] ID. — CONSPIRACY — EVIDENCE — INSTRUCTIONS.—In such prosecution, where there was some evidence that two men acting together

5. Burden of proof and sufficiency of evidence of alibi, note, 8 Ann. Cas. 1189. See, also, 8 Cal. Jur. 187; 8 R. C. L. 224.

6. Extrajudicial identification, note, Ann. Cas. 1914B, 700. See, also, 8 Cal. Jur. 36, 615; 8 R. C. L. 183.

7. See 8 Cal. Jur. 618; 2 R. C. L. 237.

8. See 8 Cal. Jur. 628; 2 R. C. L. 256; 14 R. C. L. 786.

9. Responsibility of one assisting in robbery during which his companion commits murder, note, 45 L. R. A. (N. S.) 55. See, also, 5 Cal. Jur. 530; 5 R. C. L. 1063.

had committed the robbery of deceased, when he was injured, it was a question for the jury to determine whether he was held up, whether two persons committed the offense, and if so whether or not the defendant took such active part as to be guilty of the battery which caused the death of deceased even though he did not actually commit the assault, and an instruction as to the responsibility of individual participants in an unlawful act which is the subject of a conspiracy was proper.

(1) 30 C. J., p. 263, sec. 504.   (2) 30 C. J., p. 256, sec. 498. (3) 30 C. J., p. 272, sec. 510.   (4) 30 C. J., p. 285, sec. 529.   (5) 16 C. J., p. 924, sec. 2281.   (6) 17 C. J., p. 321, sec. 3664.   (7) 17 C. J., p. 308, sec. 3654.   (8) 17 C. J., p. 342, sec. 3690.   (9) 30 C. J., p. 395, sec. 640.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Arthur Keetch, Judge. Affirmed.

The facts are stated in the opinion of the court.

William T. Aggeler, Public Defender, and Frederick H. Vercoe and Franklin Padan, Deputy Public Defenders, for Appellant.

U. S. Webb, Attorney-General, and John W. Maltman, Deputy Attorney-General, for Respondent.

CRAIG, J.—Appellant was convicted of the crime of murder in the first degree and the penalty fixed at life imprisonment. This appeal is based principally upon alleged insufficiency of the evidence to establish the *corpus delicti;* also upon an alibi, and asserted errors in ruling upon the admissibility of evidence, and in the instructions to the jury.

In attempting to establish the *corpus delicti* it was sought to introduce statements of the deceased, and much evidence was offered for the purpose of showing that he was impressed with a consciousness of impending death at the time they were made. The first point of appellant is that this foundation was not sufficient to permit of the introduction of the decedent's declarations as to his injuries and concerning the person or persons who had inflicted them upon him.

On Sunday, August 26, 1923, at about 9:30 in the evening, a police officer first saw Gordon McCutcheon, the decedent, in

an alleyway, in the city of Los Angeles, in a stooping position, as if arising to his feet; when the policeman approached he observed that McCutcheon had apparently been beaten about the face, and that there was blood on his face and on the front of his clothing. Eleven days later McCutcheon died from the injuries received at that time. The facts upon which the people relied for a foundation upon which to introduce his declarations were substantially as follows: McCutcheon arrived at his home at about 10:30 at night; members of his family testified that his face was badly swollen, one eye was entirely closed, and his clothing was soiled with blood. He had previously been in good health, but on this occasion he complained of his body paining him, and went to bed, where he remained until the following Wednesday; physicians were called in and visited him each day, and on Thursday, August 30th, he was up and dressed and attended court; on Sunday evening, September 2d, he returned to his bed, and was ordered to the hospital by his physician, who concluded it was a surgery case, though McCutcheon's temperature had been normal, pulse slightly elevated, his abdomen showed tenderness and his bowels were inactive. A surgeon who examined him at the hospital described his condition as "very bad," stating that he found evidences of strangulated bowel, and decided to operate, but that he and his consultants did not believe the man could live. On Thursday, September 6th, an operation was performed, which revealed a ruptured intestine, general peritonitis— an inflamed condition of the intestines and surrounding structures and pronounced inflation. Immediately following the operation McCutcheon died. The surgeon who performed the autopsy found a gangrenous condition at the junction of the large and small bowels, and a rupture of the left side of the diaphragm through which a large portion of the great omentum was protruding, and which had not been disclosed by the operation because it was above and not within the region then explored. It was testified that these conditions would result only from the force of great pressure, or a blow, from without.

When McCutcheon first arrived home on the night of August 26th he told his wife that he felt very badly, and then and on subsequent occasions he said: "I don't think I will be here with you long"; "I believe I am done for."

He told his brother on the 27th that he did not think he would live; about three days before his death he said to his daughter: "Mary, don't go to work; I won't ever pull through with this"; for her to be a good girl, and to pray for him, that he was "going to die." She testified that on two occasions thereafter her father told her that he was not going to live, though she admitted that on one occasion he asked her to pray for him to get well.

It is contended on behalf of the appellant that the interval between the time of the injury and the death of McCutcheon, his apparent improvement after the third day, his attendance at court and request that his daughter pray that he might get well, all support the conclusion that at the time of any declarations he may have made he was not in a dying condition, and entertained such a degree of hope for recovery that he could not have believed that he was not going to recover. [1] Statements made by a mortally wounded person, who repeatedly says that he does not expect to recover, followed by death from the identical injuries which he had in mind, after being committed to a hospital by a physician who swears that he believed the patient would die, furnish sufficient ground for the conclusion that such statements emanated from a mind impressed with ·the solemnity of the occasion as though under the binding force of a legal oath. This is essentially so when such facts are supported by the conditions revealed by the operation and the autopsy. [2] According to the authorities it is the condition of the mind that governs, rather than the construction to be placed upon peculiar circumstances such as the degree of possibility that the person might, with the symptoms described, have recovered. [3] That McCutcheon was beaten and ruptured internally, and that experienced physicians and surgeons recognized his condition as being fatal, that he repeatedly stated that he believed he must die, and that he did die from such rupture, though some days later, are facts which present as strong a case for the application of the rule admitting the statements in question as dying declarations as we have been able to find since *People* v. *Ybarra,* 17 Cal. 166, and *People* v. *Lee,* 17 Cal. 76, which are somewhat analogous to the case at bar, and are in harmony with the more recent case of *People* v. *Cord,* 157 Cal. 562 [108 Pac. 511]. In the latter case it was said:

"We have no decision in this state declaring the meaning of the phrase 'a dying person,' in section 1870 of the Code of Civil Procedure. It does not mean that in order to make such declaration admissible the person making it must be at the time in the act of expiring or in the final death struggle. It is seldom that a human being in that stage of dissolution is capable of making any statement whatsoever in the nature of a connected or reliable narrative or account of a past transaction. To admit such declarations only when made by a person in that condition would practically exclude them altogether, or render them useless for any purpose. We think the intention of the codifiers was to express, as clearly and comprehensively as was compatible with the necessary brevity, the rule on the subject of the admissibility of dying declarations as it had previously existed. By this rule it was not necessary that the person should be at the time in the throes of death, or that he should die immediately, or within any specified time thereafter, in order to give the declaration probative force. . . . It was considered that the belief that a fatal wound had been received and that death was about to ensue therefrom would deter such person from uttering a willful untruth about its cause, if not as effectively as would the sanction of an oath reinforced by the earthly penalty for its violation, at least sufficiently to justify its admission as evidence of the facts recounted. Where a person has been fatally wounded, is in sore distress therefrom, and believes that he will not recover and is soon about to die, his statement made in this belief relating to the cause of his injury is admissible, if it appears that he subsequently died from the direct effects of the wound, although he may have revived after making the statement or may have lived a considerable time thereafter, and may have again begun to hope for recovery. Such a person is to be deemed 'a dying person' within the meaning of the statute from the time the wound is received until death results from the injury, and his statement during that period made in view of death, and with the belief that it is near at hand, may be proven to establish the cause of death."

Objection to the introduction of the decedent's statement was therefore properly overruled. It was then related by the police officer that Mr. McCutcheon conducted him to a restaurant 175 feet from where he was found, where the latter

identified the defendant, who after being arrested escaped
and ran. The officer testified that the deceased, pointing to
Ybarra, said, "That is one of the men that held me up."
Members of his family stated that upon returning home he
told them that a Mexican had held his hands behind him
while another took about fifty dollars from his pockets, and
that they had then beaten him severely. The policeman also
testified that the defendant was the man identified at the
restaurant by McCutcheon, and that the defendant's hands
were bloody, that there was blood on his shirt and on his
sleeve; that the officer took the decedent to the receiving
hospital, then returned to a house near the restaurant, where
he found the defendant and placed him under arrest; he
further testified that Ybarra offered to give him what money
he had if he would let him go.

A lieutenant police detective by the name of Lopez testi-
fied that he questioned appellant on the day following his
arrest and that appellant told him in Spanish that he had
nothing to do with the holdup, but that he ran when the
officer came to arrest him because he was frightened; that the
witness acted as interpreter for the district attorney at the
latter's office at a later date when the appellant stated in
response to questions that he met the deceased in the alley
and that he took hold of him; that he got the blood on his
hands in that manner and went to the restaurant to eat and
to wash his hands. Upon the trial of this case the appellant
testified that he first went to a picture show, on the evening
of August 26th, then to a restaurant where he had a drink
that crazed him; that while in the restaurant the officers
came in and that one of them struck him on the nose, and
that this was the cause of blood appearing on his hands and
on his clothing. On the stand he denied any knowledge of
being in the alley, or of having seen McCutcheon, and denied
that he made the statements to which Lopez testified; on
cross-examination he testified that he could not remember
the theater that he had attended, or what he saw there; that
when he entered the restaurant he asked the proprietress
for something to eat, and that she said they did not have
anything to eat, but that she placed some wine before him
that was poisonous, and although he went in also to wash
his hands he did not ask for water. The officer testified that
he made no attempt to strike the appellant, and the woman

who conducted the restaurant where he was found testified that when appellant entered and sat down she asked him what he wanted and that he said "nothing."

[4] The argument that the evidence furnishes grounds for an inference that death could have resulted from accident or natural causes and that the *corpus delicti* was therefore not established in this case is untenable for the reason that there is much evidence strongly tending to prove criminal agency, and this testimony, the statements of the decedent and of appellant were predicated upon sufficient foundation and were properly admitted. The contradictory nature of appellant's various narrations, conflicting with the direct recitals of several eye-witnesses, fully justified, if they did not compel, the conclusion that he was not worthy of belief. His brief is prolific with quotations of authorities holding that where it is just as reasonable to suppose that the deceased came to his death from other causes as from the hand of the accused, the *corpus delicti* is not established; but none of them go so far as to hold that where all the evidence offered by the prosecution tends to prove the offense charged, that the mere suggestion by the defendant of other possible theories will nullify it. Were such a rule to be recognized few criminal cases would get to the jury.

[5] What has been said also applies to the question of appellant's asserted alibi. It was within the exclusive province of the jury to determine whether he had made conflicting statements upon that point, and if so which, together with all the other evidence in the case, was true.

[6] Another point raised by appellant is that regardless of the question of admissibility of other statements claimed to have been made by McCutcheon regarding the cause of his injuries, it was error on the part of the trial court to permit his family to testify that he told them he had identified one of the Mexicans who held him up, and that he was in jail. It is argued that this was not part of the *res gestae*, and he quotes from *People* v. *Cyty*, 11 Cal. App. 702 [106 Pac. 257], and other cases, wherein it was held that such evidence "must be restricted to the act of killing, and to the circumstances immediately attending it and forming a part of the *res gestae*." It is said in the case at bar that the statement of decedent was a narration of a subsequent transaction, or a mere opinion of the decedent. Appellant con-

tends that this testimony was highly prejudicial, and that the judgment should be reversed upon the authority of *People* v. *Carkhuff*, 24 Cal. 640, which held that evidence there admitted "tended to prove the presence of the defendant at the house of the deceased on the night of the murder, and that may have been the evidence that mainly satisfied the jury that he was present at the time." However, in the instant case the correctness of the ruling of the court as to the admissibility of the evidence under consideration was entirely immaterial, and had it been omitted there were four witnesses for the People who testified to the occurrences at the restaurant; the defendant himself stated that McCutcheon pointed him out at that place, and the police officer related all of the circumstances of the identification, arrest, and imprisonment of appellant. Hence, whether or not McCutcheon told his family that he had identified the defendant in the restaurant, it was not an issue, and any error in admitting testimony as to what he said in that behalf was harmless. (*People* v. *Wolff*, 182 Cal. 728 [190 Pac. 22]; *People* v. *Ong Mon-Foo*, 182 Cal. 697 [189 Pac. 890]; *People* v. *Goodwin*, 132 Cal. 368 [64 Pac. 561]; *People* v. *Sanchez*, 23 Cal. App. 743 [139 Pac. 820].)

[7] Again, it is objected that respondent was permitted to impeach certain of its own witnesses, and that this was prejudicial error. The only instance we find that is worthy of notice, and to which objection was interposed, was the submission to the witness Godoe when she testified at the trial of a portion of her testimony given at the preliminary examination. The report of her former testimony contained the statement that she saw blood on the appellant's face when he entered her restaurant; but she testified at the trial that she saw only dirt upon his face. The prosecution being surprised sought to refresh her memory and she testified that they must have misunderstood her at the preliminary, because she did not know about any blood being on his face, that it was dirt. This was not an attempt to impeach her, but it brought forth testimony favorable to the appellant, and in any event would not constitute prejudicial error. (*People* v. *Glover*, 141 Cal. 233, 243 [74 Pac. 745]; *People* v. *Casselman*, 10 Cal. App. 234 [101 Pac. 693].)

[8] The court below instructed the jury that "A person must be presumed to intend to do that which he voluntarily

and willfully does in fact do, and must also be presumed to intend all the natural, probable and usual consequences of his own acts. Therefore when one person assails another violently with a dangerous weapon, likely to kill, and which in fact does destroy the life of the party assailed, the natural presumption is that such assailant intended death, or other great bodily harm, and in the absence of evidence to the contrary this presumption must prevail." Appellant contends that there was no evidence of his having used a dangerous weapon, and that this instruction led the jury to believe that he did in fact assail the deceased with a dangerous weapon. It is conceded by respondent that there was no evidence as to any weapon, but as was said in *People* v. *March,* 6 Cal. 543, 547, "there is no evidence in the record upon which to base the instruction, or to show its relevancy, and we have before decided that we would not disturb a judgment of the court below on account of an erroneous instruction, which was not applicable to the facts of the case. (See *People* v. *Roberts,* 6 Cal. 214.)" The same ruling was made in *People* v. *Dole,* 5 Cal. Unrep. 934 [51 Pac. 945]. In *People* v. *Methever,* 132 Cal. 326 [64 Pac. 481], it was held that where there was no evidence that the defendant charged with murder was drunk at the time the crime was committed, an instruction as to the effect of drunkenness, while unnecessary, was not prejudicial.

[9] The jury were also instructed as to the responsibility of individual participants in an unlawful act which is the subject of a conspiracy, and appellant asserts that he was prejudiced thereby, since there was no evidence of this offense having been committed as a result of a conspiracy. The evidence discloses that decedent had said that two Mexicans held him up; he pointed out the defendant to the officers, saying to them "that is one of the Mexicans that held me up," but there is no evidence as to which of the men struck him. This was some evidence that two men acting together had committed the robbery of McCutcheon, when he was injured. It was purely a question for the jury to determine whether he was held up, whether two persons committed the offense, and if so whether or not the defendant took such active part as to be guilty of the battery which caused McCutcheon's death even though he did not actually commit the assault. "The general rule is well settled that,

where several parties conspire or combine together to commit an unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine." "But whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury." (*People* v. *Kauffman,* 152 Cal. 331 [92 Pac. 861].) The jury in the instant case were instructed in the exact language of the opinion above quoted, and an instruction requested by the defendant was also given, that "it must appear from the evidence and beyond a reasonable doubt that the defendant and not some one else committed the offense charged," and that "to warrant a conviction of the defendant he must be proven to be guilty clearly and conclusively beyond all reasonable doubt, so that there is no reasonable theory upon which he can be innocent when all of the case is taken together." Upon the record before us we think that the instructions fully and fairly presented the law of the case, and were proper.

The only remaining points raised relate to instructions given which under various rulings have been approved, or to the refusal to give requested instructions which were covered by others already given. It is not necessary to review them here. After careful consideration of the entire record, we are satisfied that no prejudicial error is contained therein, and the judgment and order denying the motion for new trial are affirmed.

Finlayson, P. J., and Works, J., concurred.