SYLVESTER J. AZBILL, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 5541

May 15, 1968                      440 P.2d 1014

*Wiener, Goldwater & Galatz,* and *John Manzonie,* of Las Vegas, for Appellant.

*Harvey Dickerson,* Attorney General, *George E. Franklin, Jr.,* District Attorney, and *Raymond D. Jeffers,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, COLLINS, J.:

This is an appeal from denial by the trial court of habeas corpus brought to test the legal sufficiency of an indictment charging murder. The lower court found the evidence sufficient and upheld the indictment. We reverse the order and remand the cause for further action.

Ed and Rose Mapel were married for over 44 years. They experienced marital difficulties and a divorce action was pending when he died in June 1967. He left a considerable estate, most of which succeeded to Rose. They had no children.

Rose Mapel married appellant, Sylvester Azbill, shortly after her former husband's death. She was 61 years and he was considerably younger in age. They continued to reside in the wife's home until the time of her death on December 27, 1967.

The state sought indictment of appellant from the Clark County Grand Jury for murder and arson. A true bill was returned on both charges after receipt of evidence. A transcript of that evidence was made and is before us as it was before the trial court. The count charging murder was attacked by appellant through habeas corpus contending the state had failed to prove the *corpus delicti* of the crime by evidence admissible for that purpose. We agree.

We, as well as the trial court, are limited to the evidence considered by the grand jury in testing the legal sufficiency of the murder indictment as to either proof of corpus delicti or probable cause. Shelby v. District Court, 82 Nev. 204, 414 P.2d 942 (1966).

Careful examination of the transcript of the proceeding discloses the following evidence relating to the murder charge:

Donna Kellogg, a niece of Rose Mapel Azbill, testified she visited her aunt and new husband in their home in Las Vegas in October 1967, meeting Azbill for the first time; that previously her aunt had never smoked and drank only slightly or casually, but while she visited the home over this particular

weekend she observed considerable drinking by her aunt and appellant; that appellant continuously kept Rose's glass filled and gave her a bottle of liquor on Sunday morning as a present; that her aunt did not appear to be in ill health but was under the influence of alcohol most of the time she was visiting; that she twice observed appellant give her aunt pills, which she took without inspecting them; that appellant in the presence of his wife told the niece he wanted to put Rose on marijuana; that as her husband he would do anything or give her anything he wanted; that appellant spoke of knockout drops or chloral hydrate; that his father was a retired doctor and that appellant had ways of getting things; that when the niece left she told appellant to be good to and care for her aunt.

Brad Azbill, 12-year-old son of appellant by a previous marriage, testified he visited appellant and his wife on December 26, 1967 and stayed there all the next day; that three of his boyfriends visited him in the Mapel-Azbill home December 27; that both appellant and Rose were drinking; that he (Brad) had "snuck" some liquor from his father; that he accompanied his father on perhaps three different occasions to the store on December 27 to get liquor and beer; that when he took the beer into Rose who was in bed in her bedroom about 7:00 p.m., he talked to her at that time but that she looked kind of sick because she had not eaten for 3 or 4 days; that she refused offers of food; that appellant asked him for the lighter fluid (or charcoal starting fluid); that he got it for appellant who took it into Rose's bedroom; that he accompanied appellant into the bedroom, where Rose was lying on her side in bed not moving or talking and appeared to be dead; that he saw appellant dump the fluid on the bed and light it; that he saw the fire start and upon expressing objection to appellant's acts, was told by appellant to "Keep your mouth shut"; that Brad's friends, Frank, Mark and John, came into the house and said they smelled smoke.

Frank Luhman, age 15 and a friend of Brad testified that he was at the Mapel-Azbill home on December 27; that he observed a large, partially-filled can of charcoal starting fluid in the house; that during the course of the day he saw and talked to Rose who was in the bedroom in bed; that after watching a television program in the guest house he and the other boys went to the main house, smelled smoke, saw fire in Rose's bedroom and tried to put it out; that appellant told him the smoke was from a Christmas tree fire; that he nevertheless opened the door of Rose's bedroom and saw smoke; that he went outside and broke windows in the bedroom and tried to

spray Rose with water and put the fire out but that he couldn't make it; that while the fire was in progress he saw Brad hold appellant around the waist and heard appellant say, "I want to get her, I want to get her."

Nancy Sue Lynch testified that she had known appellant since June 1967; that on December 27 she received a telephone call from appellant who stated he wanted to see her at the Mapel-Azbill residence; that she took a taxi to the home arriving about noon; that she was greeted by Brad and the other boys and taken to the guest house behind the main house; that appellant came to the guest house, talked and argued with her; that he was drunk, in a cast and on crutches; that she had sexual relations with appellant; that appellant told her that Rose Azbill was sick and she was lying there dying and that they knew in three or four days she would be dead and then he would have all that money and the house and that she [Nancy Sue Lynch] would come back to him; that before leaving the house Brad brought her a check for $50.00 in payment for the sexual relations.

Richard H. Bast, Fire Marshal, testified that the fire in the bedroom was incendiary in origin and caused by a flammable fluid.

John Wesley Grayson, Jr., M.D., a pathologist, who examined the body of Rose Azbill testified that there was no specific cause of death which could be identified in the body; that he found no evidence of disease process in Rose's body sufficient to cause death by natural means or confinement to bed; that he found no evidence of suffocation, hemorrhage, broken bones in the neck or structure of the voice box which would indicate manual strangulation, but neither could he refute suffocation or manual strangulation; that due to a lack of soot particles in the lungs and carbon monoxide in the blood stream Rose had not taken a single breath during the fire and was dead without respiration at the time the fire began; that in his opinion the medical cause of death was most probably due to a combination of barbiturates (sleeping pill type of tablets) and ethanol (alcohol).

Thorne Butler, M.D., also a pathologist specializing in toxology, testified he examined the organs of Rose Azbill's body and found present ethanol and phenobarbital, neither at a concentration level which alone would be fatal; that the combination of the two toxic substances in the level of concentration found is highly dangerous; that in many reported cases a level of concentration of the two toxic substances found in Rose Azbill resulted in death; that he found no other factors

that could have caused death; that in his opinion the most probable cause of Rose Azbill's death was the combination of drugs and alcohol.

Appellant attacks the sufficiency of the evidence to sustain the indictment (NRS 172.155(2); Shelby v. District Court, supra) and contends (1) there was no evidence before the grand jury to establish the second element of the corpus delicti, i.e., the criminal agency of another person causing the death; (2) the lower court erred when it held the corpus delicti could be proved by implied admissions (admissions by action) but not express admissions (extrajudicial admissions).

Respondent, urging that we uphold the order of the lower court, contends (1) that we should infer that a criminal agency caused the death of Rose Azbill from all the evidence; (2) that there was no evidence there were any barbiturates or alcohol in the room for her to take and that someone must have taken them in to her; (3) that one and one-half hours after Rose was observed in a weakened condition for lack of food, had no alcohol or pills available to her and while alone in the house with appellant, she was burned [to death].

The trial court ruled (1) that all the evidence taken before the grand jury established probable cause to believe an offense had been committed and that defendant committed it; (2) that the corpus delicti must be established by evidence independent of and prior to receipt of statements, confessions or admissions of the defendant; (3) that the corpus delicti may be established by circumstantial evidence and reasonable inferences drawn therefrom; (4) that the determination of the criminal agency factor in proof of the corpus delicti is a question for the jury and not the court.

The death of a human being may be brought about by any one of four means: (1) natural causes; (2) accident; (3) suicide; or (4) criminal means.

If a death is thought to be caused by criminal means and a person is charged with a crime for causing that death, before he can be held for trial two things must be proved by sufficient legal evidence before a grand jury if an indictment is sought or before a magistrate if a complaint is filed and a preliminary hearing is held. They are (1) the fact that a crime has been committed; and (2) probable cause to believe that the person charged committed it.

In proving the crime, which is otherwise known as the corpus delicti two elements must be established (1) the fact of death;

and (2) the criminal agency of another responsible for that death. Beasley v. Lamb, 79 Nev. 78, 80, 378 P.2d 524 (1963).

The fact of death of Rose Azbill is conceded by both parties. That her death was caused or brought about by the criminal agency of another (without saying whom in proving corpus delicti), is the point strongly contested here.

Technically, we suppose, if it were possible to conduct the proceedings in such a precise manner, evidence should be offered first to prove the corpus delicti and only after that was established by lawful evidence of the proper degree should the state turn to the proof of probable cause. However, as any prosecutor, defense counsel or judge knows, it is often not practical to present evidence in such a manner.

Thus evidence and testimony on both points, corpus delicti and probable cause, comes in often, if not always, intermingled and without specific control as to which of the points it is offered to prove.

As demonstrated by the cases reviewing whether corpus delicti was proved by evidence lawful for that purpose, the courts look at the entire record and without regard to the order in which it came in or that certain types of evidence may not be considered in proving corpus delicti (confessions for example) and hold that there was sufficient evidence to establish the corpus delicti independent of confessions and possibly admissions, but that the latter may then be used to corroborate or strengthen the proof of the corpus delicti. Sefton v. State, 72 Nev. 106, 295 P.2d 385 (1956); In re Kelly, 28 Nev. 491, 83 P. 223 (1905); People v. Jacobson, 405 P.2d 555 (Cal. 1965).

Once the corpus delicti is determined to have been proved by lawful evidence, confessions and admissions may clearly be considered in establishing probable cause to show that it was the particular defendant charged who was the criminal agency causing the death. In re Kelly, supra.

Proof of the corpus delicti may be made by direct evidence, People v. Watters, 259 P. 442 (Cal. 1927); partially by direct and partially by circumstantial evidence or totally by circumstantial evidence. State v. Ah Chuey, 14 Nev. 79 (1879); State v. Loveless, 17 Nev. 424, 30 P. 1080 (1883); People v. Clark, 233 P. 980 (Cal.App. 1925); Hartman v. State, 206 S.W.2d 380 (Tenn. 1947); People v. Scott, 1 Cal.Rptr. 600 (Cal.App. 1959).

The trial court erred in assessing its function as to the proof of the corpus delicti. At the trial stage, the state must prove the existence of the corpus delicti, along with all other aspects of the crime, beyond a reasonable doubt. Sefton v. State, supra. See NRS 175.191, 175.201. At that time, the presence or existence of the corpus delicti is a question for the jury. However, on review by habeas corpus of the sufficiency of the evidence to support an indictment, the function of the district court judge is to determine whether the state has fulfilled its burden on that point. Its burden is only to show that there is "probable cause to believe that an offense has been committed and the defendant committed it." NRS 172.155(1).

In a holding to answer proceeding charging murder, as here, the state must offer evidence in proving the corpus delicti, to establish affirmatively that the death was the result of the criminal agency of another.

If, in considering all the evidence admissible upon the element of corpus delicti, it cannot be said there was sufficient evidence to make it appear the death resulted from another's criminal agency the state has failed in its burden and the person charged may not be held to stand trial on that charge.

We think that clearly is the situation here. If every bit of evidence in the record before us is considered on the question of the second element of the corpus delicti, there is not sufficient proof that the death resulted from the criminal agency of another to uphold the indictment. We need not therefore consider the question whether the corpus delicti may in part be proved by implied admissions. Nor do we reach the question of probable cause that appellant committed the crime.

The evidence presented to the grand jury was more susceptible of belief that Rose Azbill came to her death by accident, natural causes, suicide or was simply unexplained than by criminal agency. State v. Kindle, 227 P. 65 (Mont. 1924); People v. Ybarra, 228 P. 868 (Cal.App. 1924). The state need not eliminate all non-criminal inferences, but there must be an inference of a criminal agency even if there are also the equally plausible non-criminal explanations. People v. Jacobson, supra. Neither the grand jury nor the reviewing court may speculate that a criminal agency caused the death. There must be sufficient proof of the hypothesis of death by criminal means.

Here Rose Azbill may have accidentally or possibly intentionally consumed too many barbiturates and too much alcohol while in a weakened, debilitated or demoralized condition causing her death. Doctors Grayson and Butler found no evidence of death by natural causes, manual strangulation or suffocation. True they suggested death possibly may have occurred by one of those means. But that opinion is too speculative to warrant holding a person for trial.

Notwithstanding evidence of the burning of Rose's body by appellant, the two medical witnesses absolutely exclude that circumstance as a cause of death. They were emphatic that Rose was dead *before* the burning; that she took not one breath after the fire started. There was no evidence before the grand jury to refute those expert opinions nor could the jurors have reached their own conclusion upon that issue. It required skills and techniques beyond a laymans knowledge.

Except for the doctors testimony, evidence of appellant's attempt to burn the body may have been circumstantial evidence admissible toward proof of the corpus delicti and of probable cause. But the state, who undertook to present evidence seeking the indictment, closed the door on death by fire in offering the testimony of Dr. Grayson.

From the evidence in the record and the inferences to be drawn from it, one plausible hypothesis of the death of Rose Azbill attributable to a criminal agency was that someone made available and encouraged her use of quantities of alcohol and barbiturates, knowing the lethal danger of the combined use of those two toxic substances. However, counsel for the state eliminated that hypothesis when in argument before us and stated that theory of criminal agency was not relied upon by the prosecution.

Accordingly we reverse the order of the lower court, and order that appellant be freed from custody under the indictment charging murder unless within a reasonable time the state elects to bring a new charge for that crime. We express no opinion upon the arson charge.

THOMPSON, C. J., ZENOFF and BATJER, JJ., concur.

MOWBRAY, J., dissenting:

I respectfully dissent. The Clark County Grand Jury indicted the appellant, Sylvester J. Azbill, for the murder of his wife, Rose. The majority has ruled that the indictment must fall because the evidence presented to the grand jury is insufficient

354

to show probable cause of the corpus delicti of the crime. I disagree.

The controlling Nevada statute is NRS 172.155,[1] which defines the degree of the evidence necessary to warrant an indictment. In accordance with paragraph 2 of NRS 172.155, supra, the appellant, by application for a writ of habeas corpus filed in the Eighth Judicial District Court, objected to the sufficiency of the evidence to sustain the indictment for murder. The District Judge denied the application for the writ, and appellant appeals. I would sustain the District Judge and order the appellant, Azbill, to stand trial on the murder charge.

Rose Mapel had been married to Edward Mapel for over 44 years. Edward died in late July 1967, leaving a most substantial estate. In October 1967, Rose, who was then 61 years of age, married the appellant, many years her junior. Azbill moved into the palatial Mapel residence in Las Vegas, where the couple resided until Rose's demise a few weeks later on December 27, 1967.

As the majority opinion states, Rose was and had been a person of moderate habits. She did not smoke and rarely drank. She was apparently in excellent health. Yet the evidence indicates that after her marriage to Azbill she started drinking heavily and took drugs which were supplied by Azbill. This course of conduct dominated the relationship of the newly married couple.

Although the record shows that Azbill knew that Rose was very ill and dying, he did nothing to aid his wife in her *illness,* as he characterized it. Rather, he advised his lady friend, with whom he had relations the afternoon of Rose's death, that Rose would soon die.[2] Azbill's prediction was correct. In fact,

---

[1] NRS 172.155. "Degree of evidence to warrant indictment; objection.

"1. The grand jury ought to find an indictment when all the evidence before them, taken together, establishes probable cause to believe that an offense has been committed and that the defendant has committed it.

"2. The defendant may object to the sufficiency of the evidence to sustain the indictment only by application for a writ of habeas corpus. If no such application is made before the plea is entered, unless the court permits it to be made within a reasonable time thereafter, the objection is waived."

(Added to NRS by 1967, 1409)

[2] "Q [by Mr. Gripentrog] Now, you had indicated that you had had conversation in the guest house. Did any of the conversation relate to Rose Azbill?

"A [by Nancy Sue Lynch] Yes, it did.

"Q And would you recite that conversation, as you recall it?

"A The whole conversation?

"Q As it related to Rose Azbill.

she died on the very same evening, when she and Azbill were alone in the house.

According to the two doctors (a pathologist and a toxicologist) who testified before the grand jury, Rose's death could have been caused by a combination of excessive alcohol and barbiturates. The doctors could not "confirm or refute that death may have been caused by suffocation." The pathologist did testify that the autopsy revealed *that death in this case was not due to one of the natural causes* such as stroke or heart attack or cancer or one of the other major diseases, or minor diseases, for that matter. *We found no evidence of disease process which would have caused death by natural means in this person.*

The doctors did rule out the possibility of death by burning "* * * because of the lack of soot particles in the lungs and also the determination of carbon monoxide in the blood of the deceased, * * *." Azbill had set fire to Rose as she lay in her bed later in the evening of December 27.[3] Before the fire department arrived, Rose was badly burned and charred about the upper extremities of her body.

---

"A *He said she was sick and she was lying there dying and that they all knew that in three or four days she would be dead and then he would have all of that money.*

"Q And anything else in addition?

"A *He would have all of that money and the house, and then I would come back to him.*"

[3]"A [by Brad Azbill, the appellant's young son] Well, see, then he [Azbill] asked for the lighter fluid and at that time I didn't really know what he wanted it for, but I went and got it for him and he had it and then he went into the room and started dumping it on the bed, or wherever—the lighter fluid—and then—

* * * * *

"A Well, then I had my face covered, and then he lit a match and then there was a little smoke and then there was a whole mess, and I ran out, and then he came out into the front room and the boys came in to see—

"Q Did he say anything to you when you got back up in the front room, Brad?

"A Yes.

"Q What did he say?

"A He said just keep my mouth shut.

"Q Did he say, 'Keep your mouth shut'?

"A You know, something like that; he just said, you know, be quiet or something like that.

* * * * *

"THE JUROR: She [Rose] did not move at all?

"THE WITNESS [Brad Azbill]: No, not that I knew, because when I came in he was in on his crutches and he leaned on—I guess he went down on the bed, you know, and started pouring, and I started saying, 'No, no, no, don't.' And he lit a match and it started and I watched and just turned around and just kind of went out and my face—"

It is this lack of clear specificity in the record establishing the precise agency of Rose's death that the majority finds insufficient to establish probable cause to believe an offense has been committed. It is on this point that I take exception.

The general rule has been well stated in People v. Aday, 38 Cal.Rptr. 199, 203 (Cal.App. 1964), "* * * that an indictment will not be set aside if there is some rational ground for assuming the possibility that the offense charged has been committed and the accused is guilty of it."

"Our function is like that of the trial court, i.e., to determine whether the members of the grand jury, acting as men of ordinary caution or prudence, could be led to believe and conscientiously entertain a reasonable suspicion that defendants were guilty of the offense charged." People v. Aday, supra.

As the majority opinion has pointed out, "The state need not eliminate all non-criminal inferences, but there must be an inference of a criminal agency even if there are also the equally plausible non-criminal explanations."

It appears to me that this case is properly viewed as follows. The record is clear that Rose did not die a natural death. There are three possible agencies of death: accidental, suicidal, and criminal. The majority has said that it was only reasonable for the grand jury to find that the agency of death was either accidental or suicidal. Assuming, as apparently the majority does, that the medical cause of death was the combination of barbiturates and alcohol, the criminal agency of death is possible. Under the facts before the grand jury, I cannot say that the criminal agency thesis was not *at least* as reasonable as the others. The majority opinion itself states that "one plausible hypothesis of the death of Rose Azbill attributable to a criminal agency was that someone made available and encouraged her use of quantities of alcohol and barbiturates, knowing the lethal danger of the combined use of those two toxic substances."

The majority contends that, since the District Attorney in oral argument before us did not specifically rely upon that theory, it has been eliminated from our consideration. I cannot agree. Our task on review is to determine whether or not *the grand jury had before it* sufficient evidence to justify the indictment. If the grand jury's interpretation of the evidence before it is reasonable, we should not now disturb it. It is not our function to draw indictments, but only to assure that when they are returned they are within reasonable bounds. Even by the majority's view of the evidence, it was reasonable for the grand jury to have concluded that the appellant had intentionally and by design brought about the death of Rose Azbill.

The majority is correct in not suggesting that one thesis for agency of death need be more plausible than the others. Indeed, as the court said in People v. Jacobson, 405 P.2d 555, 560 (Cal. 1965), which authority was relied upon by the majority:

"With two possible contrary inferences before it, the court did not err in ruling that a prima facie showing of corpus delicti had been made. To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency * * * even in the presence of an equally plausible noncriminal explanation of the event."

Appellant argues that the conduct of his burning Rose's body is an implied admission and therefore may not be considered until after the corpus delicti has been independently established. Appellant's contention is without merit. I know of no rule which, under a factual pattern such as we find in this case, requires the grand jurors to blind themselves to one of the most glaring and relevant circumstances in the case. The burning of Rose's body by Azbill, as a fact, was a perfectly proper matter for the grand jury's consideration.

The rule is well settled in People v. Spencer, 208 P. 380, 390 (Cal. 1922), that: "* * * the fact that death was produced by a criminal act may be shown 'by means of circumstantial evidence, * * * *including facts of conduct on the part of the accused,* may be taken into consideration.'

" 'Nor, * * * is it essential that the corpus delicti should be established by evidence independent of that which tends to connect the accused with its perpetration. The same evidence which tends to prove one may also tend to prove the other, so that the existence of the crime and the guilt of the defendant may stand together inseparable on one foundation of circumstantial evidence.'

"The rules above stated are now so generally accepted in all the American states as well as in England that they have become elementary in the law." See also People v. Mohr, 75 P.2d 616 (Cal.App. 1938).

An implied omission is conduct from which guilt of the accused can be inferred. To exclude such conduct when it also has independent significance as circumstantial evidence would appear most unreasonable.

" '* * * Crimes, and especially those of the worst kinds, are naturally committed at chosen times, and in darkness and secrecy; and human society must act upon such indications as

the circumstances of the case present or admit, or society must be broken up.' " People v. Spencer, supra, at 390.

The concealment or attempted destruction of the body of a person can properly be regarded as an incriminating circumstance and may be given positive force in connection with other facts. Annot., 2 A.L.R. 1227 (1919).

Appellant urges that the rule against admitting admissions and confessions prior to a prima facie showing of corpus delicti be extended to the factual situation before us. However, no persuasive policy reason has been offered in support of his contention. The circumstantial evidence here in question is not uncorroborated, fabricated testimony which might wrongfully establish a crime; rather, it is a factual occurrence from which reasonable inferences can be drawn. People v. Scott, 1 Cal. Rptr. 600 (Cal.App. 1959), cert. denied, 364 U.S. 471 (1960); 48 Calif.L.Rev. 849 (1960).

We have not been asked to pass on the guilt or innocence of the appellant, Sylvester J. Azbill. This would be the duty of the court or the jury before whom Azbill would stand trial. Our sole function at this juncture is to determine whether all the evidence before the grand jury, "taken together, establishes probable cause to believe that an offense has been committed and that the defendant committed it." NRS 172.155, supra.

It is my opinion that the action taken by the grand jury was not unreasonable and is supported by the record.

As this court ruled in Kelly v. State, 84 Nev. 332, 440 P.2d 889 (1968), probable cause is a standard of reasonableness which must be interpreted in a common-sense and realistic manner.

The order of the District Judge denying appellant's application for a writ of habeas corpus should be affirmed, and the appellant, Sylvester J. Azbill, should be ordered to stand trial for the murder of his wife, Rose.