Steffen, C. J.,
dissenting:
I suggest that the majority’s reliance on Charles Dickens as the basis for a preeminent rule applicable to this case is greatly misplaced. The principle applicable here is one of law rather than philosophy, and it states that “[wjhere . . . there is substantial evidence to support the jury’s verdict, it will not be disturbed on appeal.” Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981). Indeed, if we were to resort to literature for supportive citations, I suggest William Shakespeare’s Hamlet, Prince of Denmark would solidly upstage Dickens where Marcellus exclaimed, “Something is rotten in the state of Denmark.” Act I, Scene 4. Unfortunately, the fruits of villainy in the instant case existed far from Denmark in the form of a decomposed corpse discovered in Reno, Nevada. “Ay, there’s the rub.” Act III, Scene 1. Because there is substantial evidence supporting Frutiger’s conviction for first-degree murder, I respectfully dissent.
I disagree with the majority’s conclusion that the grand jury had insufficient evidence upon which to find probable cause that the victim’s death was caused by a criminal agency. The law applicable to sustainable indictments is that the State must present only sufficient evidence to create a reasonable inference that the accused committed the charged offense. Such evidence may be of a quality that is only slight or marginal. State v. Boueri, 99 Nev. 790, 672 P.2d 33 (1983). The State met its evidentiary burden, both before the grand jury and at trial. I will, however, confine my discussion of the evidence to Frutiger’s trial, since, to this writer’s knowledge, our court has not reversed criminal convictions resulting from trials on the merits even though the State’s burden was arguably not met before a grand jury or at a preliminary hearing. See Snow v. State, 101 Nev. 439, 445, 705 P.2d *1393 632, 637 (1985), cert. denied, Snow v. Nevada, 475 U.S. 1031 (1986), (“Assuming, without deciding, that a convicted defendant may challenge on appeal a denial of a pretrial petition for habeas corpus predicated upon lack of probable cause to indict . . . .”). The reason we do not reverse criminal convictions despite arguably deficient indictments is because indictments do not involve a determination of the innocence or guilt of an accused. See Etcheverry v. State, 107 Nev. 782, 785 n.2, 821 P.2d 350, 352 (1991).
In the unreported case of Weeks v. Nevada, this court upheld two counts of murder against Weeks despite the fact that no bodies were ever found and that the corpus delicti was established solely by circumstantial evidence. In Weeks we relied heavily on Sheriff v. Larsgaard, 96 Nev. 486, 488, 611 P.2d 625, 626-27 (1980), for the proposition that proof of the corpus delicti may be demonstrated entirely by direct evidence, a combination of direct evidence and circumstantial evidence, or “totally by circumstantial evidence.” (Emphasis supplied.) See also State v. Pyle, 532 P.2d 1309 (Kan. 1975). We also noted that “[t]he two elements of the corpus delicti of murder are (1) the fact of death, and (2) a criminal agency of another responsible for that death.” Id. I suggest that both elements of the rule are met in the instant case.
The first element, the fact of death, is conceded. However, the majority, relying primarily upon Azbill v. State, 84 Nev. 345, 440 P.2d 1014 (1968), concludes that the State failed to satisfy the second element, i.e., prove that Poulter (the victim) died by means of a criminal agency. Azbill is distinguishable. In Azbill the court noted that the State’s expert witness excluded fire as a cause of the victim’s death, and that the victim “may have accidentally or possibly intentionally consumed too many barbiturates and too much alcohol while in a weakened, debilitated or demoralized condition causing her death.” Id. at 353, 440 P.2d at 1019. However, the court proceeded to postulate that if the State had proffered a hypothesis that the defendant had knowingly encouraged or made available copious quantities of drugs and alcohol to the victim, a criminal agency could have been established to satisfy the corpus delicti requirements. Id. Moreover, the two medical experts found no evidence of death by natural causes, strangulation or suffocation, but suggested that death could have occurred by one of those means. In short, the court reversed Azbill’s conviction because the State failed to produce a theory concerning death by criminal agency.
In the instant case, the medical experts could not exclude death by means of either suffocation or strangulation. The majority, casting aside the jury’s factual finding of Frutiger’s guilt, has actually reached the conclusion that most of the trial evidence *1394 concerning the victim’s death “generally” favored Frutiger. Moreover, the majority concludes, ipse dixit, that the State “did not even assert what the hypothesis [of death by criminal agency] might be.” This is flat out wrong. The State’s position was that Frutiger murdered Poulter either by suffocation, strangulation or a combination of both, although the exact cause of death was not ascertainable because Frutiger kept the corpse hidden in a closet until it reached a state of decomposition that precluded such a diagnosis. Given the fact that murder convictions are sustained despite the lack of a corpse, the majority’s ruling in the instant case would paradoxically jeopardize most prosecutions of non-witnessed murder cases where a perpetrator is able to conceal the victim’s body for a sufficient length of time to foreclose a precise determination of the cause of death.
The circumstantial evidence against Frutiger is extremely compelling, and substantially supports the jury’s finding that Frutiger murdered Poulter. Commencing with the fact that the medical testimony could not rule out Poulter’s death by either strangulation or suffocation, consider the following circumstantial evidence against Frutiger:
1. Poulter moved into room 35 of the Regency Motel on June 29, 1993; Frutiger moved into room 37 of the Regency Motel on July 2, 1993.
2. On July 23, 1993, Frutiger “officially” moved into Poulter’s room at the Regency Motel.
3. The motel manager, Linda Walker, once heard Frutiger and Poulter yelling at each other; another tenant, Mary Coblentz, testified that she witnessed Frutiger hit Poulter.
4. Although Poulter had always paid the room rent by check, on approximately August 1, 1993, Frutiger paid for two weeks’ rent with cash.
5. On August 3, 1993, the occupant of room number 36 at the Regency Motel complained of a foul odor.
6. On August 4, 1993, a maintenance worker crawled underneath the building and determined that the odor was not caused by a ruptured sewer line; Walker then went to room 35 and told Frutiger that she was attempting to locate the source of the smell. Frutiger told Walker that Peggy (Poulter) was in the shower.
7. After Walker was told by Frutiger that Peggy was in the shower, Walker returned to her house; five minutes later, a maid informed Walker that Frutiger was leaving.
8. Walker and the maintenance man then went to room 35, knocked, and walked inside.
9. Walker testified that there was a “putrid smell” in the room and that the shower was on but not occupied; Walker also testified that there were flies everywhere, and that pots, pans, and *1395 garbage were piled against the closet door, and a rag was stuffed underneath the door.
10. Walker saw a large object inside the closet with garbage bags at each end; she then called the police.
11. Detective Reed testified that he found Poulter’s nude •body in the closet with a garbage bag over each end; there was also a dead cat inside one of the bags, and the body, cat and bags were wrapped in a blue comforter.
12. The motel room had not been forcibly entered and there were no male clothes in the room.
13. The detective found Poulter’s purse, but her driver’s license, credit cards, and checks were missing.
14. Detective Jenkins testified that he found Poulter’s beige Oldsmobile outside the Carson Nugget in Carson City; later, Frutiger approached the car, looked in all four directions, and then entered the car.
15. The police converged on Frutiger, took him into custody, and found in his wallet Poulter’s driver’s license, one of her credit cards, and an automatic teller machine (ATM) receipt from the victim’s account; police also discovered a briefcase in the vehicle that contained numerous documents belonging to Poulter.
16. Detective Jenkins investigated Poulter’s account and determined that from July 31 to August 4, 1993, there were ATM withdrawals from Poulter’s account that were in excess of the single-day withdrawal limit.
17. Poulter’s mother, Betty Ann Hansen, testified that her daughter appeared to be in good physical health; she also testified that Peggy was “tight-fisted” with her money.
18. The victim’s mother also admitted that Poulter had once been denied employment because of high cholesterol and blood pressure; she also admitted that Poulter was a “heavy drinker” who had attended Alcoholics Anonymous for a while before she started drinking again.
19. Walker testified that when Poulter was alive, there was nothing about Poulter’s appearance that would indicate that she was in poor health.
20. A branch manager at First Western Bank testified that from May 10, 1993, the date Poulter opened her account, to July 4, 1993, there were only three withdrawals made from the ATM and that otherwise Poulter had minimal activity on her account; she also testified that after July 4, 1993 (two days after Frutiger moved next door to Poulter), the ATM withdrawals greatly increased, and that from July 31, 1993 through August 4, 1993, the maximum amount of $500.00 per day was withdrawn each day.
21. Dr. Ritzlin, a certified pathologist who examined *1396 Poulter’s body, testified that the body was severely decomposed and that Poulter could have been dead from a minimum of two days to over a week; Dr. Ritzlin also testified that he could not determine the cause of death because of the severe decomposition of the body.
22. Dr. Ritzlin, in pertinent part, testified that Poulter could have died from alcohol consumption at a lethal level (her blood alcohol level was determined to be .341), heart disease, cirrhotic liver, or strangulation; he also testified that he discovered “bleeding in Poulter’s neck area,” but clarified that it was a small area and that generally, strangulation involves a lot of trauma to the neck.
23. Dr. Butler, another pathologist, testified that after receiving the tests run by Dr. Ritzlin, and running some tests of his own, there was uncontroverted evidence that Poulter was a chronic alcoholic; he also concluded that Poulter had “mild heart disease” and “moderate diastolic hypertension.”
24. Although Dr. Butler concluded that in his opinion the “most likely cause of death is due to the syndrome of chronic and acute alcoholism,” he also stated on cross-examination that “I think I can rule out strangulation; I don’t think I can rule out asphyxiation.” Moreover, Dr. Butler reached his “most likely” conclusion after erroneously stating that Dr. Ritzlin, who performed the autopsy, did not find any evidence of trauma (Dr. Ritzlin found a bruise “in the neck, a small bruise about an inch by one half an inch near the thyroid cartilage”), or anything that would indicate strangulation (Dr. Ritzlin stated that “she [the victim] could have been strangled and I couldn’t tell”). The foregoing recital of the evidence of record supplies the basic thrust of the trial evidence that convinced the jury that Frutiger was guilty of first-degree murder. Considering, as we must, the evidence in a light most favorable to the State, I have no difficulty affirming the jury’s verdict. From the time of Poulter’s death, none of Frutiger’s actions has been consistent with innocence. To the contrary, hiding the body (while undoubtedly considering a plan for its disposal), lying to the manager about the victim being in the shower when she was, in fact, dead, and withdrawing the victim’s money from her account as rapidly as possible, are all reflective of a guilty mind. Moreover, when it became apparent to Frutiger that he and his crime would soon be discovered, he left the motel, without notice, in the victim’s vehicle.
The majority has in effect disregarded all of the evidence of Frutiger’s guilt on the basis of the inconclusive medical testimony which Frutiger himself brought about by concealing the body until it reached a degree of decomposition that precluded a determination of the cause of death. The State presented a strong *1397 circumstantial case, and the medical experts could not rule out the State’s theories of either suffocation, strangulation or a combination of both. Dr. Butler’s opinion that the most likely cause of death was the syndrome of chronic and acute alcoholism was not fully informed, was not dispositive, and was not binding on .the jury. Ironically, if Poulter’s body had never been found, and Frutiger had been located in possession of Poulter’s credit cards, money (removed from victim’s ATM) and automobile, it is very likely that Frutiger would have been convicted of Poulter’s murder on that circumstantial evidence alone.
I believe the jury was percipient and fully justified in drawing inferences of guilt against Frutiger from the strong circumstantial evidence adduced at trial. I therefore respectfully dissent.