*1386 OPINION
By the Court,
Young, J.:
Charles Dickens noted, we should “take nothing on its looks; take everything on evidence. There’s no better rule.” Charles Dickens, Great Expectations ch. XL (1861). Therefore, even after discerning all the facts from the evidence, we conclude that there was not sufficient evidence to support the indictment or conviction of Clinton Frutiger (“Frutiger”).

FACTS

The following is a summary of the evidence presented before the grand jury: Linda Walker (“Walker”), manager of the Regency Motel (“Regency”) in Reno, testified that on June 29, 1993, she rented room number thirty-five to Peggy Poulter (“Poulter”). When Poulter registered at the motel, she registered a beige Oldsmobile, but she was driving a Ford pickup truck. On July 2, 1993, Walker rented room number thirty-seven to Frutiger. When Frutiger registered, he drove the beige Oldsmobile to the motel. According to Walker, Frutiger and Poulter started “being together constantly.” On July 23, 1993, Frutiger officially moved to Poulter’s room. Although Walker testified that Frutiger and Poulter seemed very close, she once heard them yelling at each other. In addition, Mary Kathleen Coblentz, a tenant at the Regency, testified that once she witnessed Frutiger hit Poulter.
On approximately August 1, 1993, Frutiger paid two weeks’ rent with cash. This was unusual because Poulter had always paid the rent with a check. On August 3, 1993, the occupant of room number thirty-six complained of a foul odor. Walker believed it was a ruptured sewer line. The next day, August 4, 1993, the maintenance man went underneath the building and discovered that the odor was not caused by a ruptured sewer line. Walker then went to room number thirty-five and told Frutiger that she was attempting to locate the smell. Frutiger said that “Peggy was in the shower.” Walker then went back to her house, and five minutes later a maid informed her that Frutiger was leaving. Walker and the maintenance man then went to room number thirty-five, knocked, and walked in. Walker testified that there was a “putrid smell” and the shower was going; however, no one was in the shower. Walker also testified that there were flies *1387 everywhere. In addition, there were pots, pans, and garbage against the closet door. There was also a rag stuffed underneath the closet door. Walker opened the closet door and saw a large object in the closet with garbage bags at each end. She then called the police.
Detective Steven Reed (“Reed”) testified that he found Poulter’s body in the closet nude, in two garbage bags, and wrapped in a blue comforter. The motel room had not been broken into and there was no male clothing in the motel room. The detective found Poulter’s purse; however, Poulter’s driver’s license, credit cards, and checks were missing.
Poulter’s body was taken to Dr. Roger S. Ritzlin (“Dr. Ritzlin”), a certified pathologist. Dr. Ritzlin testified that Poulter’s body was severely decomposed and she had been dead for a minimum of two days, but it could have been over a week. Dr. Ritzlin also testified that he could not determine the cause of death because of the decomposition. In addition, Dr. Ritzlin testified that Poulter had coronary artery sclerosis (hardening arteries) and a fatty liver. The fatty liver is a typical sign of heavy drinking.
Dr. Ritzlin testified that Poulter’s blood alcohol level was .341; and although blood alcohol may increase with decomposition, Poulter’s blood alcohol alone could have caused her death. In sum, Dr. Ritzlin determined that Poulter could have died of heart disease, cirrhotic liver, alcohol consumption at a lethal level, or strangulation — although specific signs of strangulation could not be determined because the body was severely decomposed.
Detective David Phillip Jenkins (“Jenkins”) testified that he discovered Poulter’s beige Oldsmobile on August 5, 1993, outside the Carson Nugget. Later, Frutiger approached the Oldsmobile, looked in all four directions, and then entered the car. The police then “converged” on Frutiger and took him into custody. In Frutiger’s wallet the police discovered Poulter’s driver’s license, one of her credit cards, and an automatic teller machine (“A.T.M.”) receipt from her account. In the car was a briefcase that contained numerous personal documents of Poulter’s. Finally, Jenkins investigated Poulter’s finances and discovered that each day from July 31 to August 4, 1993, Poulter’s A.T.M. withdrawals were in excess of the limit that may be withdrawn in a single day.
Based on the evidence discussed above, on October 13, 1993, the grand jury indicted Frutiger. On November 5, 1993, Frutiger filed a pretrial petition for a writ of habeas corpus, arguing that there was not sufficient evidence presented to the grand jury to constitute probable cause for indictment. The district court denied Frutiger’s pretrial petition for a writ of habeas corpus, and a trial was held on April 11-14, 1994.
*1388 Additional evidence was presented at trial. First, Betty Ann Hansen (“Hansen”), Poulter’s mother, testified that Poulter moved to Reno in May 1993 and stayed at Hansen’s home. In June Poulter moved out and began staying at the Regency because she was attending computer school downtown.
At the end of July, Poulter introduced Hansen and Frutiger and expressed that she was very happy because Frutiger had graduated from college and was helping her with computers. Hansen saw Frutiger one other time when Frutiger came to Hansen’s house and mowed her lawn.
Hansen testified that Poulter appeared in good physical health. However, on cross-examination Hansen admitted that Poulter was once turned down for employment because of high cholesterol and high blood pressure. In addition, Hansen admitted that Poulter was a “heavy drinker” and for a while had attended Alcoholics Anonymous, but then began drinking again. Finally, Hansen testified that Poulter was “very happy” that she met Frutiger and that if Poulter was abused in any way, she would have certainly told Hansen.
In addition, at trial Dr. Ritzlin expanded the testimony that he had previously given before the grand jury. Dr. Ritzlin revealed that he discovered “bleeding in [Poulter’s] neck area.” However, he clarified that this was a small area; and generally if someone is strangled, there is considerable trauma to the neck. Dr. Ritzlin testified that people who die of heart disease generally appear healthy right up to the time of death. Dr. Ritzlin affirmed his earlier conclusion that Poulter’s death could have been caused by heart or liver failure. In addition, Dr. Ritzlin testified that the garbage bag over Poulter’s head was “draped” — it was not tightened.
Dr. Thorn Butler (“Dr. Butler”), another pathologist, concluded that there was “uncontroverted evidence that she [Poulter] was a chronic alcoholic.” Dr. Butler also concluded that Poulter had “mild heart disease” and “moderate diastolic hypertension.” In addition, contrary to Dr. Ritzlin’s testimony, Dr. Butler believed that as a general rule, blood alcohol level goes down in a decomposing body. However, Dr. Butler’s ultimate conclusion was that the “most likely cause of death is due to the syndrome of chronic and acute alcoholism.” Dr. Butler stated on cross-examination, “I think I can rule out strangulation; I don’t think I can rule out asphyxiation.”
Frutiger was found guilty of first degree murder and sentenced to life in prison without the possibility of parole. Frutiger appeals, raising several assignments of error. Because we conclude that there was insufficient evidence to support Frutiger’s indictment and conviction, it is unnecessary to address Frutiger’s remaining contentions.

*1389
DISCUSSION

Before a person may be held for trial, the grand jury must determine that there is probable cause to believe (1) an offense (otherwise known as the corpus delicti) has been committed; and (2) the defendant has committed it. NRS 172.155. On appeal, Frutiger first argues that there was insufficient evidence before the grand jury to prove the corpus delicti.
In proving the corpus delicti, “two elements must be established (1) the fact of death; and (2) the criminal agency of another responsible for that death.” Azbill v. State, 84 Nev. 345, 350-51, 440 P.2d 1014, 1017 (1968) (citation omitted). In the case at bar, the fact of death is conceded. Therefore, the central issue is whether the grand jury could have found probable cause that Poulter’s death was caused by the criminal agency of another.
The only evidence before the grand jury as to the actual cause of Poulter’s death was Dr. Ritzlin’s testimony that although Poulter could have died of natural causes, he could not rule out the possibilities of strangulation or suffocation. We conclude, primarily based on Azbill, that this is not enough evidence to prove Poulter died by a criminal agency and to have held Frutiger over for trial.
In Azbill, this court held that the defendant should not have been indicted because there was no proof that the death of the victim was caused by a criminal agency. In Azbill, the defendant lit the victim on fire in her bed. Although this was not prudent on the defendant’s part, the pathologists both agreed that the victim was dead before she was burned. In addition, the pathologists could not find any evidence of “natural causes, manual strangulation or suffocation.” Id. at 353, 440 P.2d at 1019.
Although the State need not eliminate all non-criminal inferences, there must be sufficient proof of the hypothesis of death by a criminal agency. In the case at bar before the grand jury, the State clearly did not present sufficient proof of a hypothesis of death by a criminal agency because the State did not even assert what the hypothesis might be. The State did not submit a possible cause of death to the grand jury. The complaint simply asserted Frutiger was charged with murder by “means currently undetermined.”[1]
This court’s conclusion in Azbill was that the pathologists’ *1390 opinions were “too speculative to warrant holding a person for trial.” Id.; see also Hicks v. Sheriff, 86 Nev. 67, 69, 464 P.2d 462, 464 (1970) (affirming this court’s finding in Azbill that “if it cannot be said there was sufficient evidence to make it appear the death resulted from another’s criminal agency, the state has failed in its burden and the person charged may not be held to stand trial on that charge”). In the case at bar, Dr. Ritzlin informed the grand jury that there was medical evidence that Poulter could have died from liver failure, heart failure or a lethal dose of alcohol. In addition, Dr. Ritzlin informed the grand jury that there was no evidence of strangulation or suffocation, but those possibilities could not be ruled out.[2]
Although there was other evidence presented before the grand jury connecting Frutiger with Poulter’s body, the present issue is whether her death was caused by a criminal agency. In Hicks, this court concluded that the fact that the defendant was driving the victim’s car at the time of his arrest was only material to show probable cause that the defendant was guilty of the crime of murder if the corpus delicti of that crime had been established. Hicks, 86 Nev. at 69, 464 P.2d at 464. The dissent, exhaustively and exhaustingly, reiterates the facts that connect Frutiger with Poulter. We do not deny that if there was evidence to show that Poulter’s actual death was caused by the criminal agency of another, there would be sufficient circumstantial evidence to uphold Frutiger’s conviction. The dissent, however, confuses the two issues and ignores this court’s decision in Hicks. Therefore, even considering the evidence linking Frutiger with Poulter, and considering Frutiger’s not-so-prudent behavior, we conclude that there was not enough evidence for the grand jury to find probable cause that Poulter’s death was caused by a criminal agency.[3]
In addition, at trial, “the fact of death and that it resulted not from natural causes, accident or suicide but from the criminal agency of another” must also be proved. See Sefton v. State, 72 Nev. 106, 109, 295 P.2d 385, 387, cert. denied, 352 U.S. 954 (1956). The dissent correctly cites authority that sufficient evidence to uphold an indictment may be of a quality that is only slight or marginal. However, the dissent uses this standard to show that the State met its burden “both before the grand jury and at trial.” However, unlike before the grand jury where the death by a criminal agency must be proved by probable cause, at *1391 trial it must be proved beyond a reasonable doubt. See id. Therefore, the proper standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Poulter’s death was caused by a criminal agency. See Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
In addition to the evidence stated above, evidence was presented at trial as to how Poulter may have died; however, this evidence did not support any theory that Poulter’s death was caused by the criminal agency of another. In fact, the evidence at trial served only to validate the fact that Poulter could have died of natural causes. At trial, Hansen testified that Poulter was an alcoholic and had been turned down for employment because of high cholesterol and high blood pressure. Dr. Ritzlin expanded his testimony and stated that a person who dies of heart disease generally appears healthy right up to the time of death. However, Dr. Ritzlin also testified as to “bleeding in [Poulter’s] neck area,” with the clarification that this was a small area; and generally if someone is strangled, there is considerable trauma to the neck.
In addition, Dr. Butler testified that Poulter had “mild heart disease” and “moderate diastolic hypertension.” Dr. Butler concluded that he ruled out strangulation and that Poulter “most likely” died from chronic and acute alcoholism. Therefore, because there was insufficient evidence to show that Poulter’s death was caused by the criminal agency of another, the jury could not have even reached the issue of whether there was sufficient evidence to link Frutiger with her death.
Accordingly, we reverse and vacate Frutiger’s judgment of conviction.
Springer and Shearing, JJ., concur.

 The indictment was changed before trial to read “by strangulation and/or suffocation.”

In Azbill the pathologists could also “not rule out” strangulation or suffocation.

We recognize, however, that Frutiger should have been charged with other crimes for his actions — but not first degree murder.