BROOKEY LEE WEST, Appellant, *v.* THE STATE
OF NEVADA, Respondent.

No. 38696

September 8, 2003

75 P.3d 808

[Rehearing denied October 24, 2003]

*Marcus D. Cooper,* Public Defender, and *Scott L. Coffee,* Deputy Public Defender, Clark County, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, and *Frank J. Coumou* and *James Tufteland,* Chief Deputy District Attorneys, Clark County, for Respondent.

Before the Court EN BANC.

## OPINION

*Per Curiam:*

Brookey West was charged with and convicted of murdering her mother, Christine Smith. West was sentenced to life in prison without the possibility of parole. West contends that (1) there was insufficient evidence of criminal agency, (2) the charging information was vague, (3) the district court erroneously admitted gruesome photographic evidence, and (4) the prosecutor committed misconduct during closing argument. We conclude that West's contentions lack merit and therefore affirm.

### FACTS

On February 5, 2001, Bill Unruh, general manager of Canyon Gate Mini Storage in Las Vegas, sensed a foul smell emanating from storage unit 317. After opening the unit, Unruh observed a garbage can with a substance oozing out. Based on the foul smell and his observations, Unruh called the police. When the police arrived, Unruh informed them that West and Smith rented unit 317 on June 26, 1998.

Joseph Matvay, a crime scene analyst, described the foul smell emanating from unit 317 as "the unmistakable smell of death." Inside unit 317, Matvay observed a substance seeping out from the

side of a green garbage can and a wet stain underneath the garbage can. Matvay conducted a presumptive blood test on the wet stain, and the test was positive. Based on the test results, Detective Todd Rosenberg secured a telephonic search warrant for unit 317. Thereafter, Matvay opened the garbage can, which was secured with several strips of duct tape, garbage bags and cellophane wrap. Matvay opined that the garbage can was sealed with great effort to make it airtight.

Upon cutting the duct tape and wrapping from the garbage can, fluid began seeping out, along with dead maggots. Once the garbage can was open, Matvay observed a human form in advanced stages of decomposition at the bottom of the garbage can. He also observed a white plastic bag covering the face, which was knotted at the back of the head. Matvay impounded the wrapping and duct tape, while the garbage can containing the human form was transported to the coroner's office. The wrapping and duct tape were processed for fingerprints; Joel Geller, latent print examiner, found a fingerprint on the cellophane wrap, which matched West's fingerprints.

In searching unit 317, Detective David Mesinar found Smith's wallet containing her identification, prescription information, and a document regarding authorization of social security payments. Based on dental records, the coroner confirmed that Smith's body was in the garbage can.

Shortly thereafter, Detective Mesinar obtained a search warrant for West's apartment. In searching West's apartment, Detective Mesinar found Smith's bank statements. During his investigation, Detective Mesinar determined that there were numerous ATM withdrawals on Smith's bank account after February 1998, when Smith was last seen alive.

West was arrested on the evening of February 5, 2001. On April 26, 2001, West was charged with murdering Smith, her 64-year-old mother, sometime in 1998 by asphyxiation, suffocation, or manner or means unknown.

Before trial, the district court held a *Petrocelli*[1] hearing. After the hearing, the district court ruled that evidence that West had accessed Smith's bank account was admissible because it was relevant to prove motive. The district court also ruled that the State could not present evidence that West possibly accessed her brother's and father's bank accounts. However, the district court allowed the admission of a letter that West sent to the Social Security Administration requesting that the social security checks of Travis Smith Jr., West's brother, be directly deposited into his bank account for the limited purpose of showing that West knew her brother was a recluse.

---

[1]*Petrocelli v. State,* 101 Nev. 46, 692 P.2d 503 (1985).

Also before trial, West filed several motions in limine, including among other things, a motion to exclude photographs of the decomposed body and to strike the language in the charging information, ''manner and means unknown.'' The district court denied both motions.

A jury trial commenced on July 3, 2001. Gary Telgenhoff, M.D., a forensic pathologist, testified that he conducted Smith's autopsy. Dr. Telgenhoff testified that Smith's body was so decomposed that the majority of it was covered with a waxy, cheese-like material, which is known as adipocere. He explained that adipocere is decomposition material produced from the breakdown of body fats and fatty acid. He maintained that the finding of adipocere was consistent with Smith's body being kept in a sealed container. He explained that it takes a minimum of six months to produce adipocere and opined that Smith's body had been in the garbage can for longer than six months. Notably, based on the maggots found inside the garbage can, Neal Haskell, Ph.D., a forensic entomologist, opined that Smith's body was placed inside the garbage can within eight hours of death.

Dr. Telgenhoff testified that when he removed the clothing from Smith's body, he observed that the clothing was not ripped or damaged. After removing the clothing, Dr. Telgenhoff took x-rays, which revealed that Smith had osteoporosis.

Dr. Telgenhoff testified that a white plastic bag covered Smith's nose and mouth. Robbie Dahn, a crime scene analyst, testified that the plastic bag covered Smith's face from the bridge of her nose to her chin. Dahn explained that the plastic bag was tied in a knot behind Smith's head at the base of her neck. Dr. Telgenhoff recovered a long hair within the knot, which according to Dr. Telgenhoff, possibly indicated that the knot was tied in haste. Dr. Telgenhoff testified that the plastic bag was tightly tied and that it would have been even tighter before decomposition. He could not testify whether the plastic bag was placed on Smith's face before or after her death, and he could not rule out the possibility that the plastic bag originally covered Smith's eyes and slipped down because of decomposition.

John Haitt testified that he tested Smith's brain for drugs, and the test was negative. However, Haitt explained that the sample was in poor condition for testing purposes because Smith's brain was liquid.

Dr. Telgenhoff opined that the cause and manner of Smith's death were undetermined. He explained that there were no remaining physical findings to suggest why or how Smith died. However, regarding the State's theory of suffocation, Dr. Telgenhoff opined that the finding of the plastic bag covering Smith's face was consistent with suffocation. Dr. Telgenhoff explained that it is

difficult to prove suffocation, but in doing so, he looks for petechial hemorrhage in the eyes—red dots on the whites of the eyes—or for pressure marks on the skin or bruising. Because Smith's body was severely decomposed, with no details of her eyes remaining and no tissue on Smith's body, Dr. Telgenhoff stated that he could not make the determination of cause of death by suffocation. Additionally, regarding the State's theory of asphyxiation, Dr. Telgenhoff stated that it was possible that Smith was placed in the airtight garbage can alive.

Because the cause and manner of death were undetermined, Dr. Telgenhoff opined that Smith's death was also consistent with natural causes. Dr. Telgenhoff testified that after Smith was identified, he reviewed her medical records; however, he did not study them in detail. He explained that nothing in Smith's medical records provided any reason for a possible cause of death. He stated that there was nothing that indicated heart disease, but he maintained that he could not rule out a possible heart attack. Dr. Telgenhoff acknowledged that Smith had asthma and that she had a lung age of 132 years.

Judy Zito-Pry, a nurse practitioner, testified regarding Smith's medical history. Zito-Pry treated Smith on several occasions, beginning on April 1, 1997. During Smith's first visit, Smith informed Zito-Pry that she had a history of asthma; a past history of smoking; and currently was having memory problems. Zito-Pry explained that in January 1997, Smith had a lung age of 132 years, and in April 1997, Smith's lung age improved to 102 years. Zito-Pry testified that she prescribed Smith two inhalers for her asthma, Maxair and Vanceril. Zito-Pry acknowledged that Maxair can cause heart irregularities and death, but maintained that those are the worst-case scenarios. Zito-Pry opined that based on Smith's last visit, January 5, 1998, Smith was basically in good health.

James Anthony, M.D., a local physician, testified on behalf of West as an expert in the area of asthma. Dr. Anthony reviewed Smith's medical records, observing that Smith had a moderate obstruction in her lungs. However, because Smith's medical records were deficient, Dr. Anthony could not opine with certainty the condition of Smith's health, but indicated that Smith was not in good health. Dr. Anthony explained that asthma is a serious disease, as 5,000 people die every year from asthma. He also testified regarding the side effects of Maxair, explaining that it is very rare that asthma patients die from Maxair.

Several witnesses testified regarding West's interactions with Smith. Gwen Reese, former manager of the apartments where Smith lived, testified that West lived with Smith a few months out of the year. She testified that West and Smith had a good mother-daughter relationship. She testified that her records indicated that Smith moved out of her apartment in June 1998. Reese stated that

West informed her that she had taken Smith to California to live with Travis Smith Jr.

Judy Chang, Smith's former neighbor, testified that she last saw Smith in February 1998. Based on her observations, Chang opined that Smith and West had a close relationship. Chang testified that three days after she last saw Smith, West informed her that Smith went to live with Travis Jr. in California. Chang stated that when she helped West move out of Smith's apartment after Smith was gone, she observed that Smith left behind a valuable ring and her wool cap that she wore every day.

Another former neighbor, Tyra Teber, testified that she talked to West regarding Smith's absence. Teber told West that Smith's friends were worried, and asked West why Smith had not written or called. West informed Teber that Smith was fine and that she did not know why her mother had not written or called. Teber testified that she never observed any problems between Smith and West. Notably, other witnesses testified that West had a strained relationship with Smith, calling her mother controlling and a sociopath.

Alice Wilsey, Smith's friend and neighbor, testified that she last saw Smith in February 1998. Wilsey testified that when she last saw Smith, Smith was very ill and lethargic. She explained that during her visit, West gave Smith several pills, calling them aspirin. Also, during her visit, Smith told Wilsey that she was going to live with her son Travis Jr. in California, and according to Smith, Travis Jr. lived with a girlfriend in an apartment. Wilsey recalled that Smith previously informed her that Travis Jr. was a homeless drug addict. Several investigators of the Clark County District Attorney's Office testified that they could not locate Travis Jr.

West did not testify at trial. However, West's counsel stipulated that West admitted to placing her mother's body in the garbage can.

On July 19, 2001, the jury found West guilty of first-degree murder. Thereafter, West was sentenced to life in prison without the possibility of parole.

## DISCUSSION

*Sufficient evidence of criminal agency*

West contends that there was insufficient evidence adduced at trial to establish that Smith died as the result of a criminal act rather than natural causes. Accordingly, West asserts that her murder conviction must be reversed. We disagree.

The corpus delicti rule in Nevada is well established. To prove that a murder has been committed, the State must demonstrate: ''(1) the fact of death, and (2) that death occurred by criminal

agency of another.''[2] At trial, the State bears the burden of establishing the corpus delicti beyond a reasonable doubt, based on direct or circumstantial evidence.[3] When reviewing the sufficiency of the evidence, we consider '' 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' ''[4] West argues that there was less proof of death by criminal agency in her case than in the previous cases in which this court reversed based on insufficient evidence of corpus delicti, namely, *Frutiger v. State*,[5] *Hicks v. Sheriff*,[6] and *Azbill v. State*.[7]

In *Frutiger,* the State presented the following evidence to demonstrate corpus delicti.[8] A motel manager, Linda Walker, received a complaint from a tenant regarding a foul odor emanating from Peggy Poulter's motel room. Walker knocked on Poulter's door and Frutiger answered. In response to Walker's request to investigate the source of the foul odor, Frutiger stated that ''Peggy was in the shower.''[9] After Frutiger left Poulter's motel room, Walker entered the room, observing a ''putrid smell.''[10] Walker also observed that the shower was running, but no one was in the shower, and further observed that the room was filled with garbage bags and flies. Walker opened the closet door, observing a large object with garbage bags at each end. Following this discovery, Walker called the police. Inside the closet, the police found Poulter's nude body, which had been wrapped in a blanket and garbage bags, along with a dead cat. The police also found Poulter's purse, noticing that her driver's license, credit cards and checks were missing. At trial, the pathologist could not determine the cause of death because of the advanced state of decomposition of the body. Medical evidence revealed that Poulter had hardened arteries, a fatty liver, and a blood alcohol level of .341. The pathologist opined that Poulter could have died from the blood alcohol level, heart disease, cirrhotic liver, or strangulation. The pathologist noted, however, that specific signs of strangulation could not be found because the body was severely decomposed.

On appeal, we noted that if evidence showed that Poulter's death was caused by the criminal agency of another, there was sufficient

[2]*Tabish v. State,* 119 Nev. 293, 312, 72 P.3d 584, 596 (2003).

[3]*Id.*

[4]*Koza v. State,* 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

[5]111 Nev. 1385, 907 P.2d 158 (1995).

[6]86 Nev. 67, 464 P.2d 462 (1970).

[7]84 Nev. 345, 440 P.2d 1014 (1968).

[8]*Frutiger,* 111 Nev. at 1386-88, 907 P.2d at 158-60.

[9]*Id.* at 1386, 907 P.2d at 159.

[10]*Id.*

circumstantial evidence that Frutiger committed the criminal act, namely, hiding Poulter's body, driving her car, and using her ATM card to withdraw money from her bank account.[11] However, we stated that the issue of whether there was sufficient evidence linking Frutiger to Poulter's death should never have been reached by the jury because the issue of whether Poulter's death was caused by the criminal agency of another was not established beyond a reasonable doubt in light of the medical evidence adduced at trial.[12]

In *Hicks,* Harvey Hicks was charged with the murder of Glen Christiernsson, but after a preliminary hearing, the charge was dismissed because the State failed to present sufficient evidence of the corpus delicti to sustain the charge.[13] Thereafter, the State filed a petition for leave to file an information against Hicks, supporting its petition with the testimony from the preliminary hearing and an affidavit from a cellmate to whom Hicks allegedly confessed the crime.[14] The district court granted the State's petition, but we reversed on appeal.

We first noted that the corpus delicti must be established before evidence of a confession or admission may be considered to prove that the accused was the criminal agency that caused the victim's death.[15] Recognizing this, we concluded that, although Hicks allegedly confessed to his cellmate, the following evidence was insufficient to establish that a criminal agency caused Christiernsson's death: Christiernsson and Hicks were seen together shortly before Christiernsson disappeared; Christiernsson's partially clothed body was later discovered in the desert; Hicks' behavior at the time of his arrest; and Hicks was driving Christiernsson's car when Hicks was arrested.[16]

In *Azbill*, we evaluated the pretrial evidence of death by criminal agency, and concluded that the State failed to prove the corpus delicti; thus, there was no probable cause to hold Sylvester Azbill over for trial on a charge of murdering his wife.[17] The State presented evidence that Azbill set his wife's bed on fire while she was in it, yet the corpus delicti was not proven in light of the medical testimony, which demonstrated that Azbill's wife was dead before the fire, likely from alcohol or drugs, as she had not inhaled smoke.[18]

---

[11]*Id.* at 1390, 907 P.2d at 161.

[12]*Id.* at 1390-91, 907 P.2d at 161.

[13]86 Nev. at 67-68, 464 P.2d at 463.

[14]*Id.* at 68, 464 P.2d at 463.

[15]*Id.* at 69, 464 P.2d at 464.

[16]*Id.*

[17]84 Nev. at 352-53, 440 P.2d at 1019.

[18]*Id.* at 353, 440 P.2d at 1019.

We disagree with West that the above cases support her contention that there was insufficient evidence of corpus delicti in the instant case, especially in light of our recent decision in *Middleton v. State.*[19] In *Middleton,* we noted that " 'there is no requirement that there be evidence of a specific cause of death.' "[20] And, " '[t]he court must consider and weigh all the evidence offered which bears on the question of death by criminal agency.' "[21] Using this standard, we upheld David Stephen Middleton's murder convictions, concluding that although the victims' actual causes of death could not be determined from examination of the bodies due to decomposition, " 'the circumstances of the disappearances of the women, the discoveries of their bodies in remote locations, tied with rope, wrapped in garbage bags, bitten severely, clearly creates a reasonable inference of their deaths by criminal agency.' "[22] Accordingly, the State may establish corpus delicti solely with circumstantial evidence, notwithstanding the lack of a body or lack of evidence of the actual cause of death due to decomposition or dismemberment of the body.[23]

In considering the weight of the evidence in the present case, we conclude that there was sufficient evidence of corpus delicti, notwithstanding the fact that the actual cause of Smith's death could not be determined. Similar to *Middleton,* the circumstances of Smith's disappearance, the discovery of her body in a garbage can that was sealed with great effort to make it airtight and located in a storage unit that West rented, the admission that West put Smith in the garbage can, and the discovery of the plastic bag that covered Smith's nose and mouth, clearly created a reasonable inference of Smith's death by criminal agency. Although Smith and West informed Smith's friends and neighbors that West was taking Smith to California to live with Travis Jr., several witnesses testified that Smith left behind several personal items when she disappeared, and there was evidence that Travis Jr. was a recluse. Finally, even though West presented medical evidence that Smith may have died by natural causes, the jury was at liberty to weigh this evidence along with the evidence that Smith died by criminal agency.[24]

---

[19]114 Nev. 1089, 968 P.2d 296 (1998).

[20]*Id.* at 1103, 968 P.2d at 306 (quoting *Sheriff v. Middleton,* 112 Nev. 956, 962, 921 P.2d 282, 286 (1996)).

[21]*Id.* (quoting *Middleton,* 112 Nev. at 964, 921 P.2d at 287).

[22]*Id.* (quoting *Middleton,* 112 Nev. at 964, 921 P.2d at 287).

[23]*Tabish,* 119 Nev. at 312, 72 P.3d at 596-97.

[24]*See Middleton,* 114 Nev. at 1102-03, 968 P.2d at 306 (noting that when there is conflicting testimony at trial, the jury, and not this court, determines the weight and credibility of the testimony).

*Charging document*

West next challenges the charging document, arguing that it failed to provide her adequate notice of the State's theory of murder. Because this challenge involves a constitutional issue,[25] we review de novo whether the charging document complied with constitutional requirements.[26]

Under the Sixth Amendment to the United States Constitution, the State is required to inform the defendant of the nature and cause of the accusation against the defendant.[27] In accordance with the Sixth Amendment, the Legislature has provided that an information "must be a plain, concise and definite written statement of the essential facts constituting the offense charged."[28] "Conclusory allegations are insufficient."[29] The Legislature has also provided that an information must specify the means by which the charged offense was committed or allege that the means are unknown.[30] The purpose of these requirements is to prevent prosecutors from changing theories mid-trial, which in effect prejudices the defendant in his or her defense.[31]

On April 26, 2001, the State charged West by information with open murder:

> That BROOKEY LEE WEST, the Defendant(s) above named, having committed the crime of **MURDER (Open Murder) (Felony—NRS 200.010, 200.030),** on or during the year 1998, within the County of Clark, State of Nevada, contrary to the form, force and effect of statutes in such cases made and provided, and against the peace and dignity of the State of Nevada, did then and there wilfully, [sic] feloniously, without authority of law, and with premeditation and deliberation, and with malice aforethought, kill CHRISTINE SMITH, a human being, by asphyxiation by suffocation and/or manner or means unknown.

[25]*See Alford v. State,* 111 Nev. 1409, 1415, 906 P.2d 714, 717 (1995).

[26]*See Givens v. Housewright,* 786 F.2d 1378, 1380 (9th Cir. 1986); *see also Sheriff v. Burdg,* 118 Nev. 853, 857, 59 P.3d 484, 486 (2002), *cert. denied,* 539 U.S. 915 (2003).

[27]U.S. Const. amend. VI; *Simpson v. District Court,* 88 Nev. 654, 656, 503 P.2d 1225, 1227 (1972).

[28]NRS 173.075(1).

[29]*Sheriff v. Standal,* 95 Nev. 914, 916, 604 P.2d 111, 112 (1979).

[30]NRS 173.075(2); *see also Evans v. State,* 117 Nev. 609, 640, 28 P.3d 498, 519 (2001).

[31]*See Simpson,* 88 Nev. at 660-61, 503 P.2d at 1230.

Considering that Smith's body was severely decomposed, we conclude that the State provided West adequate notice in the charging information regarding its theory of murder. The charging information provided that the murder occurred sometime in 1998 and by means of suffocation, asphyxiation, or manner or means unknown. "We are not concerned with whether the information could have been more artfully drafted, but only whether as a practical matter, the information provides adequate notice to the accused."[32] Moreover, contrary to West's contention, the State did not change theories mid-trial.

*Photographic evidence*

West next contends that the district court erred in admitting photographic evidence. The district court admitted three photographs: two photographs of Smith's head, which showed how the plastic bag was tied and what parts of Smith's face the plastic bag covered, and a photograph of Smith alive. We will not disturb a district court's decision to admit photographic evidence unless the district court abused its discretion.[33]

NRS 48.025(1) provides that all relevant evidence is admissible. However, relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice.[34] "We have repeatedly held that '[d]espite gruesomeness, photographic evidence has been held admissible when . . . utilized to show the cause of death and when it reflects the severity of wounds and the manner of their infliction.' "[35] Accordingly, "gruesome photos will be admitted if they aid in ascertaining the truth."[36]

We conclude that the district court did not abuse its discretion in admitting the gruesome photographs. The photographs only showed Smith's head and were shown to aid the jury in understanding how the plastic bag was tied on Smith's head and what parts of Smith's face the plastic bag covered. Also, we conclude that the district court did not abuse its discretion in admitting the photograph of Smith alive. Although the district court noted that the relevance was questionable, the court also noted that it was reasonable for the jury to see Smith alive because her body was severely decomposed.

[32]*Sheriff v. Levinson,* 95 Nev. 436, 437, 596 P.2d 232, 234 (1979).

[33]*See Browne v. State,* 113 Nev. 305, 314, 933 P.2d 187, 192 (1997).

[34]NRS 48.035(1).

[35]*Browne,* 113 Nev. at 314, 933 P.2d at 192 (quoting *Theriault v. State,* 92 Nev. 185, 193, 547 P.2d 668, 674 (1976) (citations omitted)).

[36]*Id.*

*Prosecutorial misconduct*

West contends that during closing argument, the prosecutor engaged in several instances of misconduct. In particular, West argues that the prosecutor invited speculation, shifted the burden, misstated the law and facts, and appealed to religious bias. We disagree and therefore conclude that West's contention lacks merit.

### CONCLUSION

Because West's contentions lack merit, we affirm her judgment of conviction.