134 Nev., Advance Opinion 107

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| AMMAR ASIMFARUQ HARRIS, Appellant, vs. THE STATE OF NEVADA, Respondent. | No. 69509 |

**FILED**

DEC 27 2018

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of three counts of first-degree murder with the use of a deadly weapon; one count of attempted murder with the use of a deadly weapon; two counts of discharging a firearm at or into a structure, vehicle, aircraft or watercraft; and five counts of discharging a firearm out of a motor vehicle. Eighth Judicial District Court, Clark County; Kathleen E. Delaney, Judge.

*Affirmed.*

Robert L. Langford, Thomas A. Ericsson, and Matthew J. Rashbrook, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and David L. Stanton, Deputy District Attorney, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.

18-910525

*OPINION*

By the Court, STIGLICH, J.:

Appellant Ammar Harris shot and killed a fellow motorist driving on the Las Vegas Strip. The motorist's car then careened down the Strip and struck a taxicab, killing both the driver and a passenger in a fiery explosion. At trial, the district court admitted photographs of the taxicab victims, including images of their bodies disfigured by the fire and subsequent autopsies. The main issue in this appeal is whether admission of the photographs amounted to an abuse of the district court's discretion. We conclude that it did. Photographs, even gruesome ones, may be properly admitted in a criminal case to show the cause of a victim's death, the nature of his injuries, and the like. But such photographs are still subject to the balancing test outlined in NRS 48.035(1), which requires a district court to exclude evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Because the challenged photographs added little to the State's case, but created a significant risk of inflaming the jury, the district court should have excluded them. However, as the admission of the photographs was harmless, and none of Harris' other claims warrant relief, we affirm.

*FACTS AND PROCEDURAL HISTORY*

Harris spent the early morning hours of February 21, 2013, partying at a Las Vegas nightclub with his girlfriend, Yeni, and two other women. At roughly 3:30 a.m., Kenneth Cherry and Freddy Walters pulled up to the club in a Maserati. They left soon after, getting back in the Maserati only to loop around the valet and park again. Around the same time, Harris and the women left the club and headed to the valet to pick up his car. When they got there, Harris realized he had left his jacket back at



the club and went to retrieve it. An argument broke out while he was gone, and Yeni saw a man waving around a gun. She went inside and told Harris about the incident. When he returned, he retrieved a gun from his glove compartment and told Yeni to use it if necessary. He then walked over to Cherry's Maserati, which drove away.

Harris and the women left shortly thereafter. As they were driving onto the Strip, Harris pulled up to Cherry's Maserati and cut it off. Harris told Yeni, who was in the passenger seat, to roll down her window and lean back. Yeni noticed the gun in his lap. Apparently foreseeing trouble, she told Harris that Cherry was not the right person. Harris ignored her. Through the window, he said something to Cherry like "What's up?" and Cherry responded with either "Do I know you?" or "I don't know you." Harris then shot Cherry, killing him almost instantly. Cherry died pressing on the gas pedal and the Maserati took off. Harris pulled ahead and kept shooting, striking Walters, Cherry's passenger. The Maserati collided with several vehicles before slamming into a taxicab at a speed of roughly 88 miles per hour. The taxicab burst into flames which engulfed the entire vehicle. The driver of the taxicab, Michael Bolden, and his passenger, Sandra Sutton, died from injuries they sustained in the crash and the fire.

The State charged Harris with the murders of Cherry, Bolden, and Sutton, and the attempted murder of Walters. The State sought the death penalty for each murder. At trial, the defense conceded that Harris shot Cherry, but argued he was not guilty of first-degree murder for two main reasons. First, Harris claimed he acted in self-defense. Pointing to surveillance videos which showed Cherry and Walters driving in and out of the valet several times and interacting with the man Yeni saw with the gun,

SUPREME COURT
OF
NEVADA

(O) 1947A

3

he claimed that Cherry and Walters had been "hunting" him and he had to shoot first to protect himself. He argued that his drug and alcohol intoxication, and his prior experience of being shot, played into his belief that he had to shoot first. He also claimed that he could not commit a premeditated murder due to his intoxication.

The State responded to Harris' self-defense claim by arguing that neither the video, nor any testimony, indicated that Cherry or Walters acted in a threatening manner. The State also pointed out that they left the club *before* Harris, which undermined his claim that they were hunting him. Finally, the State argued that even if Harris consumed alcohol or drugs before the shooting, he was not so intoxicated that he was unable to form the intent necessary to be guilty of first-degree murder. The jury found Harris guilty of three counts of first-degree murder with the use of a deadly weapon, one count of attempted murder with the use of a deadly weapon, and other felonies. After a penalty hearing, the jury found beyond a reasonable doubt that ten aggravating circumstances applied to each murder, and no juror found any mitigating circumstances. The jury imposed a sentence of death for each murder. This appeal followed.

## DISCUSSION

### Admission of gruesome photographs

The main issue presented in this appeal is whether the district court abused its discretion when it admitted photographs of the victims who died in the cab. Before addressing this issue in more detail, we must first address Harris' assertion that we should not give deference to the district court's decision because it did not identify specific reasons for admitting the photographs and therefore we can only speculate as to the basis for its decision. Given the state of the record, we do not agree. Harris sought to

exclude the photographs before trial. The district court agreed that the photographs were "quite disturbing" and asked the State why they were necessary. The State then went through each photograph, one by one, and explained why each was necessary; broadly, the State argued that the photographs showed the manner in which the victims were found, the extent of their injuries, and the cause of their deaths. Harris responded that none of these issues were in dispute, and he affirmatively stated that he would not endeavor to put them in dispute. The district court later admitted the photographs. Under these circumstances, we can fairly infer that the district court credited the State's arguments for admitting the photographs over Harris' arguments to the contrary. We therefore review for an abuse of discretion. *See, e.g.*, *West v. State*, 119 Nev. 410, 420, 75 P.3d 808, 815 (2003) (reviewing a district court's decision to admit photographic evidence for an abuse of discretion).

*The district court abused its discretion*

Citing NRS 48.035(1), Harris argues that the photographs were so unnecessarily graphic that they risked outraging the jury, and that potential for unfair prejudice substantially outweighed any probative value the photographs otherwise had. The State responds that this court has routinely upheld the admission of such photographs when used to show the nature of a victim's injuries and the manner of their infliction, or when they otherwise assist the jury in ascertaining the truth of a matter at issue. And, the State argues, the photographs were particularly necessary here because not only did it have to prove that Harris killed Cherry, it had to prove that he was responsible for the more attenuated deaths of the victims in the taxicab. *See Doyle v. State*, 116 Nev. 148, 161, 995 P.2d 465, 473 (2000)

(holding that a defendant puts all elements of an offense at issue by pleading not guilty).

The State is correct that photographs of a victim's injuries tend to be highly probative and thus are frequently deemed admissible in criminal cases despite their graphic content. *See, e.g.*, *Browne v. State*, 113 Nev. 305, 314, 933 P.2d 187, 192 (1997); *see also* 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:18 (4th ed. 2018) ("Photographs have long been used in criminal cases to put before juries the image of dead victims . . . [to] show cause of death, identity of the victim, position of the body, the nature and relationship of the wounds, and the appearance of the scene."). But while that is generally true, it does not mean such photographs are *always* admissible, regardless of the facts and circumstances of a given case. Nevada law does not categorically admit or exclude such photographs; rather, like all evidence a party seeks to introduce, they are subject to the balancing test set out in NRS 48.035(1), which precludes the admission of evidence when its probative value is substantially outweighed by the danger of unfair prejudice. NRS 48.035 requires the district court to act as a gatekeeper by assessing the need for the evidence on a case-by-case basis and excluding it when the benefit it adds is substantially outweighed by the unfair harm it might cause.

While the record suggests that the district court adopted the State's reasoning for the admission of each photograph, the record does not evidence a meaningful weighing of the potential for unfair prejudice against each photograph's probative value, which leads us to conclude that the district court did not properly fulfill its role as gatekeeper in this case. *See Hall v. Commonwealth*, 468 S.W.3d 814, 827 (Ky. 2015) (observing under similar facts that "[t]his is the prototypical case where [the equivalent of

NRS 48.035] required the trial judge to comb through and exclude many of the offered photographs; it required the judge to recognize and safeguard against the enormous risk that emotional reactions to the inflammatory photos would obstruct the jury's careful judgment and improperly influence its decision"). The photographs at issue are shocking. In full color and high-resolution, they show the terrible aftermath of the taxicab's explosion and the further mutilation caused by the victims' autopsies. They include images of charred limbs and burned flesh, dissected tracheas and chest cavities ripped open, and the desecrated bodies of human beings who clearly died a horrific death. Their graphic nature could easily inflame the passions of a reasonable juror, consciously or subconsciously tempting him or her to evaluate the evidence based on emotion rather than reason—the very definition of unfair prejudice. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997) (explaining that, in the criminal context, the term "'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged"); *see also State v. Eighth Judicial Dist. Court (Armstrong)*, 127 Nev. 927, 933, 267 P.3d 777, 781 (2011) (recognizing that evidence can be unfairly prejudicial when it appeals to "the emotional and sympathetic tendencies of a jury" (internal quotation marks omitted)).

In contrast, the photographs' probative value was unquestionably minimal under the circumstances. The term "'probative value' sums up the positive benefits of evidence the trial judge should weigh against the potential harms listed in [NRS 48.035(1)]." 22A Charles Alan Wright et al., Federal Practice & Procedure § 5214.1 (2d ed. 2018). It turns on "the actual need for the evidence in light of the issues at trial and the other evidence available to the State." *State v. Jones*, 450 S.W.3d 866, 894-

Supreme Court
of
Nevada

(O) 1947A

7

95 (Tenn. 2014). This was not a scenario where the State needed the photographs to prove a fact important to the case. *See, e.g., Robins v. State*, 106 Nev. 611, 623, 798 P.2d 558, 566 (1990) (upholding the admission of gruesome photographs where they showed a pattern of significant physical abuse supporting the intent required for murder); *Doyle*, 116 Nev. at 160, 995 P.2d at 473 (upholding the admission of gruesome photographs which showed that shoe impressions left on the victim's body were consistent with those in the killer's possession). Indeed, there was not even a remote suggestion that the victims died by means other than the impact and explosion. *See Olds v. State*, 786 S.E.2d 633, 641 (Ga. 2016) ("'The more strongly an issue is contested, the greater the justification for admitting other act evidence bearing on the point.'" (quoting Mueller & Kirkpatrick, *supra*, § 4.21)). And the State had abundant, far less inflammatory evidence in its arsenal to satisfy its burden of proof on the elements and to support the testimony of the relevant witnesses, including a video of the Maserati striking the taxicab. *See Hall*, 468 S.W.3d at 824 ("When there is already overwhelming evidence tending to prove a particular fact, any additional evidence introduced to prove the same fact necessarily has lower probative worth, regardless of how much persuasive force it might otherwise have by itself."). Moreover, Harris conceded that he would not dispute the victims' causes of death or that his actions proximately resulted in those deaths. This concession alone did not render the photographs inadmissible, *see Doyle*, 116 Nev. at 161, 995 P.2d at 473, but when their probative value was already low, and the risk of unfair prejudice unduly high, it was a relevant factor for the district court to consider, *see United States v. Ford*, 839 F.3d 94, 109 (1st Cir. 2016); *see also Old Chief*, 519 U.S. at 186 (explaining that

Supreme Court
of
Nevada

(O) 1947A

8

a defendant's concession may be considered when assessing probative value).

The purpose of this decision is not to retreat from the general principle that, despite gruesomeness, photographs of a victim's injuries are typically admissible in a criminal case. We also recognize that the State is usually entitled to present its case in the manner it believes will be most effective. *See Old Chief*, 519 U.S. at 188 ("[T]he prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault."). Had the district court more meaningfully culled the photographs or otherwise limited their use, our analysis might be different. *See, e.g., Ybarra v. State*, 100 Nev. 167, 172, 679 P.2d 797, 800 (1984) (observing that the district court reduced the inflammatory potential of a photograph by reducing its size). The same might be true if the Maserati struck a hearse instead of a taxicab, raising even the slightest possibility that the occupants were dead at the time of the crash. But we reject the notion that the jurors in this case had to see multiple color photographs of the victims' charred bodies splayed across an autopsy table to appreciate the medical examiner's testimony that they were alive when the Maserati struck the taxicab. And we do so mindful that no one was suggesting otherwise and there was a wealth of less inflammatory evidence available to establish that point. We therefore hold that the photographs' probative value was substantially outweighed by the danger of unfair

prejudice and the district court abused its discretion by admitting them.[1] *See Leavitt v. Siems*, 130 Nev. 503, 509, 330 P.3d 1, 5 (2014) ("An abuse of discretion occurs when no reasonable judge could reach a similar conclusion under the same circumstances.").

### The admission of the photographs was harmless

Having concluded that the district court abused its discretion, we turn to whether the error was harmless.[2] For nonconstitutional errors like this one, reversal is only warranted if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Knipes v. State*, 124 Nev. 927, 935, 192 P.3d 1178, 1183 (2008) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Applying that inquiry, we conclude that the improper admission of the photographs was undoubtedly harmless. Almost all of the relevant events, from the moment Harris left the club to the moment the taxicab exploded, were captured on video, and eyewitness testimony filled in any gaps. That evidence conclusively showed

---

[1]Our decision relates only to the guilt phase. To the extent Harris challenges the admission of the photographs in the penalty phase, he fails to demonstrate an abuse of discretion. *See* NRS 175.552(3) ("During the [penalty] hearing, evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to the sentence, whether or not the evidence is ordinarily admissible."); *see generally People v. Henriquez*, 406 P.3d 748, 776-77 (Cal. 2017) (upholding the admission of gruesome photographs in the penalty phase of a murder trial when the photographs demonstrated the real-world consequences of the defendant's actions).

[2]Although the State did not adequately brief whether the error was harmless, *see* NRAP 28(b), we decline to treat this as a concession of error. *See* NRS 178.598 (recognizing that this court shall not grant relief based on harmless errors). We caution the State that our decision might have been different in a closer case.

that Harris shot and killed Cherry without any viable justification, meaning he was also responsible for killing Sutton and Bolden. Harris' assertions of self-defense and voluntary intoxication were weak, and they were undermined by his actions after the shooting, which were entirely inconsistent with the actions of a person who had acted lawfully. *See United States v. Hasting*, 461 U.S. 499, 512 (1983) (finding an error to be harmless "[i]n the face of [the] overwhelming evidence of guilt and the inconsistency of the scanty evidence tendered by the defendants"); *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (considering the strength of the State's case when assessing harmlessness). Thus, while the photographs carried an undue risk of inflaming the jurors' emotions, and that risk substantially outweighed the photographs' minimal probative value, we do not believe it had a substantial influence over the jurors' evaluation of the evidence, particularly when they could see the relevant events unfold for themselves. In addition, the district court tempered the photographs' inflammatory effect by warning jurors about their content ahead of time and admonishing the courtroom audience not to react when they were displayed. Considering all of this, and in light of the overwhelming evidence supporting the verdict, we conclude that no relief is warranted. *See Kotteakos*, 328 U.S. at 764 ("If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.").

 

*Other assertions of error*

Harris raises several other assertions of error in this appeal. Although we conclude that none of them warrant relief, we briefly discuss each one.

First, he claims that his right to a fair trial was violated when his trial was broadcast on television and reported on by the media. He fails, however, to provide adequate citation to the record supporting this assertion. He does not demonstrate that media coverage of his trial was unduly pervasive nor does he meaningfully discuss relevant considerations for determining whether media coverage deprived him of a fair trial. *See Skilling v. United States*, 561 U.S. 358, 382-84 (2010) (identifying factors such as (1) the size and characteristics of the community, (2) whether the news stories contained a confession or blatantly prejudicial information, (3) the amount of time between the crime and the media coverage, and (4) whether the jury's verdict undermined a presumption of bias). He therefore fails to demonstrate that relief is warranted on this claim.

Second, he argues that the district court should have given the instruction he requested regarding voluntary intoxication. *See Nay v. State*, 123 Nev. 326, 330, 167 P.3d 430, 433 (2007) (reviewing a district court's refusal to give a jury instruction for an abuse of discretion). However, he fails to adequately explain why the instruction he proffered should have been given. Moreover, the jury was instructed that his drug and alcohol intoxication could be considered in determining his intent, and he does not explain why this instruction was insufficient.

Third, he argues that he is entitled to a new trial because the verdict form did not allow the jury to find him guilty of voluntary manslaughter, even though the jury had been instructed that it could find him guilty of the offense. Although the verdict form was incomplete, we conclude that no relief is warranted under the circumstances. The jury was instructed to first consider whether Harris was guilty of first-degree murder, and to consider lesser offenses only if it could not agree or acquitted him of the greater offense. The jury was also properly instructed on the necessary elements of voluntary manslaughter. Because the jury was otherwise properly instructed and overwhelming evidence supports the jury's conclusion that Harris was guilty of first-degree murder, we conclude that the failure to give a complete verdict form was harmless. *See McNamara v. State*, 132 Nev. 606, 621, 377 P.3d 106, 116 (2016) (holding that the failure to include a lesser offense on a verdict form is harmless where the jury is otherwise properly instructed and the evidence supporting the verdict is overwhelming). We also note that if the jury believed Harris was not guilty of first-degree murder, it could have found him guilty of second-degree murder, further reducing any concern that he was harmed by the failure to give a verdict form on voluntary manslaughter. *Cf. Beck v. Alabama*, 447 U.S. 625, 637 (1980) (discussing the dangers of failing to instruct on a lesser included offense in capital case).

Fourth, Harris argues that the prosecutor committed misconduct in the penalty phase by (1) arguing that Harris would not feel remorse in prison and (2) arguing that a life sentence for each victim would mean Harris would not be separately punished for killing three people. We are not convinced that the prosecutor committed misconduct when he argued that Harris would not feel remorse in prison, but regardless, Harris

(O) 1947A

did not object to the statement and fails to demonstrate plain error. *See Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (holding that a defendant who fails to object to prosecutorial misconduct must demonstrate plain error affecting his substantial rights). To the extent the prosecutor improperly argued that a death sentence was necessary because there were multiple victims, no relief is warranted because the district court sustained Harris' objection to the argument, and although the prosecutor briefly continued it, the jury knew it had been deemed improper and there is no indication that it had a substantial effect on the sentences.

Fifth, Harris asserts that he should not be eligible for a death sentence for the murders of Bolden and Sutton because he did not intend to kill them. His arguments are not well-developed, and he fails to convince us that our decision in *McConnell v. State*, 120 Nev. 1043, 102 P.3d 606 (2004), applies to the circumstances of this case, or that permitting death-eligibility for murders based on transferred intent does not narrow the class of death-eligible defendants. *See generally Tison v. Arizona*, 481 U.S. 137, 158 (1987) (recognizing that the United States Constitution allows defendants to be death-eligible for murders they did not intend where a defendant was a major participant in a felony and acted with reckless indifference to human life).

Sixth, Harris asserts that the district court should have granted his motion to compel the State to produce data and statistics regarding the death penalty. He does not provide relevant authority supporting his position that he had a right to the information requested, and he does not establish that he could not get the information from other sources. Moreover, his assertion that this court needs the requested information to

SUPREME COURT
OF
NEVADA

(O) 1947A

conduct its mandatory review of the death sentences pursuant to NRS 177.055(2) is meritless.

Finally, Harris asserts that cumulative error deprived him of due process. We disagree because whether considering them individually or together, the errors we have identified were unquestionably harmless. *See Valdez v. State*, 124 Nev. 1172, 1195, 196 P.3d 465, 481 (2008) (assessing cumulative error by considering whether the issue of guilt is close, the quantity and character of the error, and the gravity of the crime charged). This case involved multiple murders and other serious offenses. The question of whether Harris was guilty of those offenses was not a close one, as the jury clearly determined that the evidence supported the State's theory of the case over Harris'. Moreover, we have only identified two errors, and neither were egregious under the circumstances. Thus, we conclude that no relief is warranted on Harris' other claims or under a cumulative-error analysis.[3]

*Mandatory review of Harris' death sentences*

NRS 177.055(2) requires this court to determine whether the evidence supports the aggravating circumstances; whether the verdict of death was imposed under the influence of passion, prejudice, or any arbitrary factor; and whether the death sentences are excessive considering this defendant and the crime. Having considered the factors outlined in the statute, we conclude that no relief is warranted. The evidence supports the

---

[3]Harris also argues that the death penalty is cruel and unusual under the United States Constitution, U.S. Const. amend. VIII, and cruel under the Nevada Constitution, Nev. Const. art. 1, § 6. He recognizes that this court has rejected this argument, but explains he is preserving it for federal review and to give this court an opportunity to reconsider its prior holdings. We decline to do so.

finding of each aggravating circumstance, most of which were conclusively established by the jury's guilt-phase verdicts. We further conclude that the death sentences are not excessive, nor were they imposed under the influence of passion, prejudice, or any arbitrary factor. *See Dennis v. State*, 116 Nev. 1075, 1085, 13 P.3d 434, 440 (2000) (explaining that this court considers whether death sentences are excessive by asking whether the crime and defendant are of the class or kind that warrants the imposition of death). The record shows that Harris made a cold, calculated decision to kill Cherry for reasons that are not entirely clear, resulting in the deaths of two innocent bystanders who died trapped in a blazing inferno. The aggravating circumstances, both statutory and nonstatutory, were compelling, and the jury did not find any mitigating circumstances. Accordingly, we affirm.

_____ , J.
Stiglich

We concur:

_____ , C.J.
Douglas

_____ , J.
Pickering

_____ , J.
Hardesty

_____ , J.
Parraguirre

(O) 1947A

CHERRY, J., with whom GIBBONS, J., agrees, dissenting:

The majority correctly concludes that multiple errors plagued Ammar Harris' trial. Yet, once again, this court affirms by summarily concluding that the verdict was untainted despite the accumulation of errors. In my view, the improper admission of the photographs and the failure to include the offense of voluntary manslaughter on the verdict form warrant reversal when considered together under a cumulative-error analysis. This court has identified three relevant factors for evaluating a claim of cumulative error: (1) whether the issue of guilt is close, (2) the quantity and character of the error, and (3) the gravity of the crime charged. *Valdez v. State*, 124 Nev. 1172, 1195, 196 P.3d 465, 481 (2008). The third factor is often misconstrued; it refers not to a sliding scale of justice where different crimes warrant different levels of judicial protection, but from a recognition that death is different and capital cases warrant particularly close appellate scrutiny. *See, e.g., Garner v. State*, 78 Nev. 366, 375, 374 P.2d 525, 530 (1962).

Applying the heightened level of scrutiny that our caselaw requires, I am convinced that the errors identified by the majority cannot be deemed harmless. First, take the majority's discussion regarding the improper admission of the photographs. Although the majority correctly concludes that the graphic content of the photographs might have caused reasonable jurors to react so emotionally that they could not neutrally evaluate the evidence, the majority somehow concludes that the jurors in this case *probably* set their emotions aside and considered the evidence dispassionately. My concern with this analysis is that it seems to consider how appellate court judges would have responded to such photographs instead of jurors. Studies have repeatedly shown that mock jurors

presented with gruesome photographs are significantly more likely to render guilty verdicts than jurors who are not. Susan A. Bandes & Jessica M. Salerno, *Emotion, Proof and Prejudice: The Cognitive Science of Gruesome Photos and Victim Impact Statements*, 46 Ariz. St. L.J. 1003, 1026 (2014). These studies also show that jurors who view gruesome photographs frequently attribute a higher level of criminal intent to a defendant than he actually possessed. *Id.* at 1026-27. The generally accepted theory is that seeing photographs of a victim's body horrifically disfigured outrages the jury, and the jury takes its outrage out on the defendant. *Id.* at 1026. Given what we know about how jurors tend to respond to such photographs—not just from the results of scientific studies, but from common sense and experience—I do not believe this court can say with confidence that admission of the photographs did not influence the way the jurors interpreted the evidence of Harris' intent, which was the key issue at trial.

I have the same concern with the majority's discussion of the incomplete verdict form. With any luck, jurors understood their instructions down to the letter and started deliberations by considering whether Harris was guilty of first-degree murder, never even noticing that the verdict form was incomplete. But we have no way of knowing whether that is the case. And while our system of justice could not function if reviewing courts did not accept the general premise that jurors follow their instructions, it would be full of empty promises if we do not remain open to the possibility that sometimes they do not. *See generally Krulewitch v. United States*, 336 U.S. 440, 453 (1949) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction." (Jackson, J., concurring) (internal

citation omitted)). This is a death penalty case, and death is different. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). In a case like the one presented, where significant errors occurred that might have influenced the verdict, any doubt should cut in favor of the defendant rather than the State. Because I cannot say with "fair assurance" that the cumulative effect of the errors in this case was harmless, *Kotteakos v. United States*, 328 U.S. 750, 765 (1946), I respectfully dissent.

_____, J.
Cherry

I concur.

_____, J.
Gibbons